UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT CINCINNATI

| | | |
|---|---|---|
| **LINDA GRUBBS** | : | **CASE NO. 13-CV-246** |
| **9676 DRY FORK ROAD** | : | |
| **HARRISON, OHIO 45030** | : | **JUDGE: J. BARRET** |
| | : | |
| **and** | : | **MAGISTRATE JUDGE:** |
| | : | |
| **TRI-SERVE, LTD, TRISERVE #1 LLC,** | : | **VERIFIED COMPLAINT AND** |
| **TRISERVE #2, LLC, TRISERVE #3, LLC** | : | **JURY DEMAND** |
| **9676 DRY FORK ROAD** | : | **ENDORSED HEREIN** |
| **HARRISON, OHIO 45030** | : | |
| | : | |
| **and** | : | |
| | : | |
| **CAPITAL CONCEPTS, INC.** | : | |
| **9676 DRY FORK ROAD** | : | |
| **HARRISON, OHIO 45030** | : | |

     **Plaintiffs:**

    **vs.**


**LARRY SHEAKLEY**
**ONE SHEAKLEY WAY**
**CINCINNATI, OHIO 45246**


**and**

**THE SHEAKLEY GROUP, INC.**
Registered Agent:   **WILLIAM N. KIRKHAM**
                           **3300 GREAT AMERICAN TOWER**
                           **301 E. FOURTH STREET**
                           **CINCINNATI, OH 45202**

**and**

**SHEAKLEY BENEFIT PLANS AGENCY, INC**
Registered Agent:   **WILLIAM N. KIRKHAM**
                           **3300 GREAT AMERICAN TOWER**
                           **301 E. FOURTH STREET**
                           **CINCINNATI, OH 45202**

**and**



FILED
JOHN P. HEHMAN
CLERK
2013 APR 15 PM 12: 00
U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

**SHEAKLEY HR, LLC**
**Registered Agent:** **THOMAS E PAPPAS JR**
                                     **100 MERCHANT ST STE 100**
                                     **CINCINNATI, OH 45246**

**and**

**PAY SYSTEMS OF AMERICA, INC d/b/a**
**SHEAKLEY PENSION ADMINISTRATION**
**Registered Agent:** **FBT OHIO, INC**
                                     **3300 GREAT AMERICAN TOWER**
                                     **301 EAST FOURTH STREET**
                                     **CINCINNATI, OH 45202**

**and**

**SHEAKLEY MEDICAL MANAGEMENT RESOURCES, LLC**
**Registered Agent:** **FBT OHIO, INC.**
                                     **3300 GREAT AMERICAN TOWER**
                                     **301 EAST FOURTH STREET**
                                     **CINCINNATI, OH 45202**

**and**

**SHEAKLEY ENTERPRISES, LLC**
**Registered Agent:** **FBT OHIO, INC.**
                                     **3300 GREAT AMERICAN TOWER**
                                     **301 EAST FOURTH STREET**
                                     **CINCINNATI, OH 45202**

**and**

**SHEAKLEY RESOLUTION SYSTEMS, LLC**
**Registered Agent:** **WILLIAM N. KIRKHAM**
                                     **3300 GREAT AMERICAN TOWER**
                                     **301 E. FOURTH STREET**
                                     **CINCINNATI, OH 45202**

**and**

**SHEAKLEY RETIREMENT PLANS, LLC**
**FBT OHIO, INC.**
**Registered Agent:** **3300 GREAT AMERICAN TOWER**
                                     **301 EAST FOURTH STREET**
                                     **CINCINNATI, OH 45202**

**and**

2

**THE SHEAKLEY GROUP, INC.**
**Registered Agent:    WILLIAM N. KIRKHAM**
**3300 GREAT AMERICAN TOWER**
**301 E. FOURTH STREET**
**CINCINNATI, OH 45202**

**and**

**FIRST FINANCIAL BANCORP**
**Registered Agent:    GREGORY A. GEHLMANN**
**255 EAST 5TH STREET, SUITE 700**
**CINCINNATI, OH 45202**

**And**

**U.S. BANCORP**

**Serve: THE CORPORATION TRUST COMPANY**
**CORPORATION TRUST CENTER 1209 ORANGE ST**
**WILMINGTON, DE 19801**

**and**

**ANGELIA STRUNK–ZWICK**
**ONE SHEAKLEY WAY**
**CINCINNATI, OHIO 45246**

**and**

**MATT SHEAKLEY**
**ONE SHEAKLEY WAY**
**CINCINNATI, OHIO 45246**

**and**

**THOMAS E. PAPPAS, JR.**
**ONE SHEAKLEY WAY**
**CINCINNATI, OHIO 45246**

**and**

**STEVE WOLF**
**ONE SHEAKLEY WAY**
**CINCINNATI, OHIO 45246**

**and**

3

**BRYAN BUNDY**
**8725 TIBURON ROAD**
**CINCINNATI, OH 45249**

**and**

**MAUREEN SURKAMP**
**ONE SHEAKLEY WAY**
**CINCINNATI, OHIO 45246**

**and**

**KEN WEBER**
**ONE SHEAKLEY WAY**
**CINCINNATI, OHIO 45246**

**and**

**SUSAN FERNBACH**
**ONE SHEAKLEY WAY**
**CINCINNATI, OHIO 45246**

**and**

**KIMBERLY MARTIN aka KYMBERLY MARTIN**
**ONE SHEAKLEY WAY**
**CINCINNATI, OHIO 45246**

**And**

**HEATHER FAIR**
**C/O EMPLOYERS CHOICE PLUS, INC.**
**7593 TYLERS PLACE BLVD.**
**WEST CHESTER, OHIO 45069**

**and**

**JAMES DEAN ALLEN**

**and**

**THE EISEN AGENCY A.K.A. EISEN MANAGEMENT GROUP, LLC**
**Registered Agent:    RODGER A. ROESER**
**                     515 MONMOUTH ST, Suite 302**
**                     NEWPORT, KY 41071**

4

**and**

**RODGER ROESER**
**6320 SATINWOOD DRIVE**
**BURLINGTON, KY 41005**

**and**

**FROST BROWN TODD LLC**
**Registered Agent:      SAMUEL M. SCOGGINS**
**                        3300 GREAT AMERICAN TWR**
**                        301 E FOURTH ST**
**                        CINCINNATI, OH 45202**

**And**

**JANE DOES AND**
**JOHN DOES (1THRU 10) UNKNOWN INCLUDING**
**THE LAWYERS INVOLVED AT FROST**
**BROWN TODD LLC**

                    **Defendants**


Comes now the Plaintiffs, Linda Grubbs, Tri-Serve Ltd, TriServe #1 LLC, TriServe #2 LLC,

TriServe #3 LLC; Capital Concepts and for their Complaint and jury demand states as follows:

## <u>INTRODUCTION</u>

This Verified Complaint is verified, comprehensive and includes voluminous exhibits based

upon the powerful Defendants named and to insure the Court recognizes not only do the claims have

merit, this Verified Complaint and accompanying exhibits prove the claims.

Fortunately, claims within the statue of limitations still exist.  June 2009 would be the month

and year of the discovery of most of the claims.  The sole reason these claims have not been filed prior

to now is prior poor advice Plaintiff's should wait until Angie Strunk-Zwick is convicted.  Plaintiffs

now file all claims with a statute of limitations of four years and longer.

## <u>PUBLIC WARNING TO ALL SHEAKLEY CLIENTS AND REGULATING PUBLIC AGENCIES</u>

Ms. Strunk-Zwick pled guilty to embezzlement by wire fraud and remains a Vice President of Operations of Sheakley HR, a business which is involved in countless wire transfers of money from bank accounts every day.  She has direct access to and/or governs employees who have direct access to thousands of bank accounts.  As reflected in this lawsuit, Angelia Strunk-Zwick should have been charged with many more crimes by state and federal authorities.  Others should have been charged. There is no statute of limitations for a felony.  Plaintiff requests further federal and state investigation of all Defendants.

## SIMPLE SUMMARY OF FACTS

Linda Grubbs owned and still owns a company called Capital Concepts, Inc.  In 2008, she bought a company named Tri-Serve from Scott Wegmen.  Angelia Strunk-Zwick managed both Capital Concepts and Tri-Serve for Linda Grubbs.  Angelia Strunk-Zwick with the assistance of Larry Sheakley and his employees literally stole Tri-Serve from Linda Grubbs for the benefit of Sheakley.  In July 2009, Angelia Strunk-Zwick and Sheakley announced and executed a "partnering" between Tri-Serve and Sheakley knowing Linda Grubbs was out of town at a conference.  Most Defendants either played a role in the theft or benefited from the theft.  The bank Defendants aided the embezzlement by Angelia Strunk-Zwick.  Angelia Strunk-Zwick pled guilty to the federal crime of wire fraud related to embezzlement.  Frost Brown & Todd's, U.S. Bank's and First Financial Bancorp's role in the story is also shameful.  Frost, Brown and Todd played nearly every side in the conspiracy.  U.S. Bank and First Financial Bancorp allowed theft of funds by Angelia Strunk-Zwick.  Meanwhile, the honorable Linda Grubbs continues to pay for her purchase of Tri-Serve despite her only having the shell of the company since the 2009 theft by Angelia Strunk-Zwick and Sheakley.  Other egregious facts to this story include:

1. The prosecutor of Ms. Strunk-Zwick in the middle of her prosecution was hired by Frost Brown Todd, who happens to be Sheakley's law firm.

2. U.S. Bank refused to properly investigate Ms. Strunk-Zwick's embezzlement of funds.  Despite finally admitting forgery, US Bank failed to compensate Plaintiffs.

3. Frost Brown Todd allegedly represented Ms. Strunk-Zwick in legal matters, involving her embezzlement while she ran a company called Transcon. This took place before she joined Capital Concepts and Tri-Serve. Then FBT received payments from Capital Concepts while Ms. Strunk-Zwick worked there. Counsel asked FBT and Ms. Strunk-Zwick the reason for these payments and have not received an answer 72 hours after asking for it in 24 hours. FBT is also counsel to US Bank. FBT at all times represented Sheakley. FBT has the distinction of having been legal counsel for the thieves and the victim of the thieves. The worse of course is their making Ms. Strunk-Zwick's U.S. Attorney prosecutor a partner in the middle of her prosecution.

4. This Complaint in sections is filled with detailed technical language and descriptions of Sheakley and Ms. Strunk-Zwick working extensively to prepare for the theft of TriServe. It is provided to indicate the efforts they went through to execute the theft and to disprove Larry Sheakley's assertion it was no big deal taking on the clients of Plaintiffs.

Finally, Larry Sheakley informed Ms. Grubbs through her prior attorney she could sue him if she wanted, but he could spend more for his lawyers than Ms. Grubbs could and she would be wasting her time.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1367, and the Racketeer Influenced and Corrupt Organizations Act (RICO)18 U.S.C.§§ 1961-1968. The Court has pendent jurisdiction of the state claims.

2. Venue is proper in this district under 28 U.S.C. §§ 1391 and 1395(a), and 31 U.S.C. § 3732(a) because the acts alleged in this complaint occurred in the Southern District of Ohio.

3. This Court has personal jurisdiction over each Defendant based upon the transaction of business within this judicial district.

## INTRODUCTION OF THE PARTIES, WITNESSES AND FACTS SUPPORTING ALL ALLEGATIONS AND CLAIMS

4. **Linda Grubbs,** formerly known as Linda Horn, hereafter Grubbs, is a genuinely accomplished, hard working, well respected, established professional, female entrepreneur with thirty eight years of experience in her field. (Exhibit 1)

5. Grubbs, is the sole owner of Capital Concepts, Inc, a financial planning, wealth management and tax preparation firm. In March of 1984, Grubbs founded, as a sole proprietor LR Horn &

7

Associates. Grubbs then incorporated LR Horn and Associates as Capital Concepts. Capital Concepts Inc. is an Ohio corporation, Charter No. 799924 on July 19, 1991. (Exhibit 2)

6. Grubbs is also sole owner of **Tri-Serve Ltd, Triserve #1 LLC, Triserve #2 LLC, Triserve #3 LLC,** a Professional Employment Organization, (PEO)**,** doing business in the State of Ohio. These companies are collectively referred to as Tri-Serve.

7. On October 13, 2008, Linda Grubbs purchased Tri-Serve from Brian Wegman.

8. Prior to Grubbs purchase of Tri-Serve, Tri-Serve was known as Tri-Serv Ltd, Tri-Serv BPO Ltd, Tri-Serv Benefits Brokerage and Tri-Serv Staffing Ltd, a Professional Employment Organization, (PEO), doing business in the State of Ohio. (hereafter collectively Tri-Serve)

9. **Angelia E. Strunk - Zwick** aka Angelia Strunk, Angelia E. Strunk, A. Strunk, A. E. Strunk, is believed to be an Ohio resident and is also a convicted felon for wire fraud in amount of $258,158.98 pertaining to the facts and allegations of this case.

10. Ms. Strunk-Zwick**,** despite her felony conviction related to the facts and allegations of this case, remains employed as Vice President of Operations with Sheakley HR Solutions, as well as an elected member of the Board of Directors for the National Association of Professional Employee Organizations, NAPEO (Exhibits 3 & 4) Plaintiffs assert this is for an obvious "keep her quiet" and "keep her close" reason based upon her knowledge of Sheakley's conduct.

11. In January 2013, Ms. Strunk-Zwick pled guilty for wire fraud in connection with the embezzlement of funds from Capital Concepts, Inc. and Tri-Serve.

12. Ms. Strunk-Zwick should have been charged with much more including bankruptcy fraud and tax evasion.

13. Ms. Strunk-Zwick awaits sentencing on May 1, 2013 in the Southern District of Ohio. She is free on bond.

14. The Court ordered Ms. Strunk-Zwick to surrender her passport, but she is still able to fly in the United States for "charitable" work.

15. Ms. Strunk-Zwick is a financial scam artist who targets unsuspecting victims like Grubbs. As reflected herein, she has no conscience and Larry Sheakley benefited, supported and encouraged her theft of Tri-Serve.

16. **Sheakley Group of Companies & all subsidiaries** handle a variety of insurance, payroll and human resource services. (hereafter Sheakley) (Exhibit 5)  References in this Complaint to Sheakley Defendants includes all companies and employees of Sheakley, including Larry Sheakley.

17. **Larry Sheakley** is the owner & CEO of the Sheakley Group of Companies. (hereafter L. Sheakley) (Exhibit 6)

18. **Matt Sheakley** is the son of Larry Sheakley and is President of Sheakley HR Solutions and an officer for Sheakley Group.(hereafter M. Sheakley) (Exhibit 7)

19. **Thomas E. Pappas,** Jr. is the CFO for Sheakley. (hereafter Pappas) (Exhibit 8)

20. **Steve Wolf** is the Senior Vice President for Sheakley HR Solutions (hereafter Wolf) (Exhibit 9)

21. **Bryan Bundy** was the former President of Sheakley HR Solutions, and currently the Director of Business Development for RightForce Solutions. (hereafter Bundy) (Exhibit 10)

22. **Maureen Surkamp** is the Controller for Sheakley. (hereafter Surkamp) (Exhibit 11)

23. **Ken Weber** is the Vice President of Tax Operations for Sheakley Uni-Service, Inc. (hereafter Weber) (Exhibit 12)

24. **Susan Fernbach** is a payroll specialist for Sheakley and former Capital Concepts and Tri-Serve employee. (hereafter Fernbach) (Exhibit 13)

25. **Kimberly Martin, aka Kymberly Martin** is an Office Coordinator for the Sheakley Group of Companies. Kym is a former Tri-Serve and Transcon employee. (hereafter Martin) (Exhibit 14)

26. **Heather Fair** was a former Human Resources/Benefits Manager at Sheakley. She is currently Director of HR and Benefits and PHR at Employers Choice Plus, Inc. (ECP). (hereafter Fair) (Exhibit 15)

27. **U.S. Bancorp Investments, Inc**. is a Delaware corporation doing business in Ohio.

9

28. **James Dean Allen,** former U.S. Bank Branch Manager, and a former co-owner of Tri-Serve. (hereafter Allen). He also had during much of the time period of these allegations engaged in an extra marital affair with Angelia Strunk-Zwick.

29. **Frost Brown Todd LLC** is a foreign Limited Liability Company organized in Delaware and is a law firm. (hereafter FBT) (Exhibit 16)

30. **Grant Cowan** is a partner at Frost, Brown and Todd, LLC (hereafter Cowan) (Exhibit 17)

31. **Neil Desai** is an attorney with Frost, Brown and Todd, LLC (hereafter DeSai) (Exhibit 18)

32. **William N. Kirkham** is an attorney with Frost, Brown and Todd, LLC. (hereafter Kirkham) (Exhibit 19)

33. **Eisen Management, LLC** is a Cincinnati based branding and marketing firm and former client and vendor for both Capital Concepts and Tri-Serve. (hereafter Eisen) (Exhibit 20)

34. **Rodger Roeser** is the owner of Eisen. (hereafter Roeser) (Exhibit 21)

35. **First Financial Bancorp** is an Ohio corporation and a bank, doing business in Ohio. (hereafter First Financial)

36. **PNC Bank d/b/a National City Bank** is a Pennsylvania corporation and a bank, doing business in Ohio. (hereafter PNC)

37. **National City Bank** is a registered trade name for PNC, doing business in Ohio. In 2008, PNC Bank acquired National City Bank. (hereafter NCB)

38. **ING Financial Partners, Inc.** is a Minnesota corporation and a bank. (hereafter ING)

39. **Palm Desert Bank** is a Texas corporation and a bank. (hereafter Palm)

40. **Fifth Third Bancorp** is an Ohio corporation and a bank, doing business in Ohio. (hereafter 5/3)

41. **Embracing Grace International Missions, Inc.** is a church and 501c(3) corporation, in the State of Ohio whose Charter Number is 1203537. (hereafter Embracing Grace)  (Exhibit 22)

42. **Bruce Machion** is an agent, trustee and incorporator of Embracing Grace and owner of Universal Training Concepts. (hereafter Machion) (Exhibit 23)

43. **Gary Osterbrock** is an incorporator of and trustee for Embracing Grace. (hereafter Osterbrock)

44. **Karl R. Resnik** is a trustee for Embracing Grace. (hereafter Resnik)

45. **Becki Neu** is a missionary for Embracing Grace. (hereafter Neu)

46. **MasterTax Service, LLC is a payroll tax software company.** It's a LLC formed under the laws of Arizona.  MasterTax software works with a company's payroll system to help them schedule, pay, balance and file their payroll taxes. (hereafter MasterTax)

47. **F.W. Davison and Company** is the developer of HR Pyramid, which serves the PEO and ASO (Administrative Services Only) employer groups industry with high performance PEO and ASO software solutions. It's a corporation organized under the rules of Massachusetts.  (hereafter Davison)

48. **Craig J. Perkins** is a friend and business partner of Ms. Strunk-Zwick. (hereafter Perkins)

49. **Kaitlyn Strunk** is the daughter of Ms. Strunk-Zwick (Exhibit 24)

50. In light of the Defendants in this case and to not only plead, but prove the allegations in this Verified Complaint, it is necessary to go back further than the incorporation of the plaintiffs PEO company, Tri-Serve.

51. A professional employer organization (PEO) is a firm that provides a service which allows an employer to outsource employee management tasks, such as employee benefits, payroll and workers' compensation, recruiting, risk and safety management, training and development.

52. A PEO achieves this by hiring a client company's employees as their employer of record for tax and insurance purposes. This practice is known as co-employment or "joint employment."

11

53. Transcon Human Resources, Inc., a PEO, was incorporated in the state of Ohio on October 5, 1998. Ultimately, Transcon Employment Company, Inc., TEC PEO, Inc. and THR PEO, Inc. were also incorporated. (hereafter Transcon) (Exhibit 25)

54. Transcon provided PEO services to small and mid-sized companies in twenty-six states. (Exhibit 26)

55. Ms. Strunk-Zwick claims credit for development and the "success" of Transcon.

56. Ms. Strunk-Zwick received awards, praise, personal and professional advancement for her development and ownership of Transcon.

57. What few knew, Ms. Strunk-Zwick embezzled in excess of a million dollars from unsuspecting Transcon clients.

58. Ms. Strunk-Zwick stole from hardworking, honest people, many of whom were senior citizens, who mistakenly placed trust in her "image." She left them in financial ruin.

59. Brian Wegman, Defendant Allen and Mr. Perkins were all employees of Transcon during Ms. Strunk-Zwick's time employed there.

60. Mr. Machion of Universal Training Concepts provided all team building training for Transcon.

61. Mr. Wegman became a close friend and confidant of Ms. Strunk-Zwick through his employment at Transcon.

62. Ms. Strunk-Zwick and Defendant Allen had an ongoing, extra marital affair through much of the time frame and events described herein. It's relevant to the conspiracy.

63. Defendant Allen would later abuse his position at US Bank to aide Angelia Strunk-Zwick to embezzle from US Bank.

64. During the years of 1998 through 2003, Ms. Strunk-Zwick charged Transcon clients and their employees for premiums, services and taxes.

65. However, Ms. Strunk-Zwick often paid late and at other times never presented payment for

Transcon's expenses, including but not limited to: client liabilities and taxes, health insurance premiums and claims, workers compensation premiums and claims and 401 K contributions.

66. Transcon charged expenses to clients and their employees. However, when Ms. Strunk-Zwick did not pay the expenses to the government it placed the employers in direct liability to their employees and governmental agencies.

67. A majority of the companies paying for Transcon's services and Ms. Strunk-Zwick's "expertise" never received the benefit of belonging to a PEO.

68. The direct benefit of belonging to a PEO is a transfer of liability from the employer to the PEO, making them co-employers, typically for the benefit of human resources and payroll expertise.

69. The egregious act of embezzlement by Ms. Strunk-Zwick, left many clients and employees of Transcon in a position of financial hardship or complete financial ruin. (She put their money in her personal accounts.)

70. Mr. Wegman gave a statement to undersigned counsel that Ms. Strunk-Zwick misled him and other close friends by convincing them for lack of payments was due to her regretful decision to become self insured. (Brian Wegman has cooperated with counsel in the prelitigation investigation.)

71. Self-insurance is a risk management method in which a calculated amount of money is set aside to compensate for the potential future loss.

72. Ms. Strunk-Zwick told Mr. Wegman that Transcon lost money due to major healthcare claims such as organ transplants, surgeries and other major health conditions as examples.

73. Ms. Strunk-Zwick later confessed to Mr. Wegman she used money from one income source to cover the expenses of another.

74. Ms. Strunk-Zwick continued used the embezzled funds from Transcon to cover the expenses of her extravagant lifestyle.

75. The embezzlement of funds led to Ms. Strunk-Zwick deciding she needed to sell Transcon.

76. On April 25, 2003, George S. Hofmeister of Paris, Kentucky incorporated two companies used

to acquire Transcon. (Exhibit 27 & 28)

77. Mr. Hofmeister changed Transcon's name to Innovative Employer Solutions. Mr. Gary Stevens served as the company's CFO. (hereafter Innovative) (Exhibit 29)

78. Innovative retained as commissioned salespersons Ms. Strunk-Zwick, Mr. Wegman and Mr. Allen.

79. In a October 2005 article in the NAPEO PEO Insider newsletter, Ms. Strunk-Zwick stated she transferred ownership of Transcon in exchange for the payment of long term debt. (Exhibit 30)

80. Mr. Wegman claims Ms. Strunk-Zwick gave no Transcon employees notice of the sale of Transcon. (Ms. Strunk-Zwick would replaythis technique on to Ms. Grubbs.)

81. Mr. Hofmeister hired new staff for Transcon.

82. The new employees hired by Mr. Hofmeister never received proper training to handle PEO clients.

83. According to Mr. Wegman, many new clients terminated their contracts with Innovative and existing clients moved to many other providers based upon service issues.

84. In the fall of 2004 and based upon their declining commissions, Ms. Strunk-Zwick, Mr. Allen and Mr. Wegman discussed leaving Innovative.

85. Mr. Hofmeister decided to "close the doors" of Innovative.

86. In October of 2004, Ms. Strunk-Zwick informed Mr. Hofmeister she, Mr. Wegman and Mr. Allen decided to terminate their employment with Innovative.

87. According to Mr. Wegman, Mr. Hofmeister informed Ms. Strunk-Zwick he would close the company. Without the company, Mr. Hofmeister expressed no interest in retaining Innovative's client base.

88. Mr. Hofmeister allowed Ms. Strunk-Zwick, Mr. Wegman and Mr. Allen to have approximately

twenty of Innovative's clients to begin their new company: TriServe.

89. Ms. Strunk-Zwick, Mr. Allen and Mr. Wegman formed TriServe with these clients.

90. Due to her legal issues from Transcon, Ms. Strunk-Zwick did not want ownership in TriServe.

91. The law firm of Frost,Brown and Todd defended Ms. Strunk-Zwick against claims relative to Transcon.

92. Ms. Strunk-Zwick told Mr. Wegman she paid FBT approximately $7,000.00 per month for defense costs but this kept her from going to prison over Transcon. Her defense for this legal matter continued for four to five years.

93. On January 25, 2005, Mr. Wegman and Mr. Allen established Tri-Serv Ltd.

94. In subsequent months Mr. Wegman and Mr. Allen established Tri-Serv Benefits Brokerage Ltd, Tri-Serv BPO Ltd, and they incorporated Tri-Serv Staffing Ltd.

95. Jack Thornton is the attorney who drafted all the operating and partnership contracts, business plans and all state and federal documents for Tri-Serve.

96. Mr. Thornton served as the statutory agent for three of the companies and drafted a "phantom agreement" which gave Ms. Strunk-Zwick a "one third ownership" in Tri-Serve.

97. All operating agreements reflect Mr. Wegman and Mr. Allen as co-owners of Tri-Serve. They employed Ms. Strunk-Zwick as Managing Director.

98. On August 15, 2005, Mr. Allen abruptly resigned and terminated his management and ownership interests in Tri-Serve.

99. Mr. Wegman signed acquired 100% of Mr. Allen's interests in Tri-Serve. (Exhibit 32)

100.On August 15, 2005, Mr. Wegman signed a "Declaration" which replaced all old Tri-Serve operating agreements and combined them into one. (Exhibit 33)

101. On August 15, 2005, Ms. Strunk-Zwick and Mr. Wegman signed a revised "phantom agreement" giving each an equal interest in Tri-Serve.

102. Mr. Allen's wife, becoming aware of Mr. Allen's affair with Ms. Strunk-Zwick led to his ownership of Tri-Serve.

103. Ms. Strunk-Zwick told Ms. Grubbs son, Brett Horn, Mr. Allen sold his ownership in Tri-Serve to salvage his marriage.

104. Mr. Allen's wife after discovering the affair with Ms. Strunk-Zwick demanded a separation between Mr. Allen and Ms. Strunk-Zwick.

105. Mr. Allen promised his wife to refrain from further contact with Ms. Strunk-Zwick.

106. Ms. Strunk-Zwick told Brett Horn: "If I ever get married again it will be to Dean."

107. Mr. Allen and Ms. Strunk-Zwick later renewed their affair leading to Ms. Allen's filing for divorce. Ms. Strunk-Zwick is named as the cause for the Allen divorce in the divorce pleadings.

108. From October through November of 2006, Ms. Strunk-Zwick introduced her long time friend and owner of Eisen Management Group, Mr. Rodger Roeser to Mr. Wegman.

109. Mr. Roeser developed and pitched branding ideas for TriServe to Mr. Wegman.

110. Mr. Eisen and Ms. Strunk-Zwick chose: Tri-Serve "It's Done!" TriServe not only paid for "It's Done," they used it as TriServe's slogan.

111. Eisen promoted Ms. Strunk-Zwick during her Transcon years to local and national magazines. They touted Ms. Strunk-Zwick's expertise and accomplishment in the PEO.

112. In 2001, Ms. Grubbs, Ms. Strunk-Zwick and Mr. Larry Sheakley were all finalists for the Ernst and Young Entrepreneur of the Year Award.

113. Ms. Strunk-Zwick and Ms. Grubbs spoke briefly backstage during the awards. They were the

only two women receiving awards:  Ms. Grubbs for Capital Concepts and Ms. Strunk-Zwick for Transcon.

114. In December 2006, Mr. Brett Horn, Ms. Grubbs son and Vice President of Capital Concepts, Inc., reintroduced Ms. Strunk-Zwick to his mother.

115. Mr. Horn and Ms. Strunk-Zwick shared a circle of friends.

116. Brett Horn maintains Ms. Strunk-Zwick told everyone she made three million dollars profit on the sale of Transcon.

117. Ms. Strunk-Zwick's friends and the business community were unaware of legal issues with Ms. Strunk-Zwick.

118. Ms. Strunk-Zwick's fabrication convinced Ms. Grubbs to believe Ms. Strunk-Zwick was a successful business woman who had independently built and sold a profitable business.

119. Unknown to Ms. Grubbs, Ms. Strunk-Zwick used her lies to cover up her $1,182,928.00 embezzlement from Transcon's 941 withholdings and her unpaid tax liability owed to the State of Ohio and the IRS.

120. The $1,182,928.00 is based on Ms. Strunk-Zwick's bankruptcy paperwork from June 30, 2009. The actual amount of her embezzlement is unknown.

121. In December 2006, Ms. Grubbs and Ms. Strunk-Zwick's discussed the benefits of cross selling the services of Capital Concepts and TriServe.

122. Ms. Strunk-Zwick and Ms. Grubbs believed the services each company offered independently could be paired together to provide a complete package of options for their clientele.

123. Also in December of 2006, TriServe's landlord gave them two months notice to relocate their office space based upon remodeling.

124. Capital Concepts had office space available for lease in their building located at 9676 Dry Fork Road, Harrison, Ohio 45030.

125. Ms. Grubbs and Ms. Strunk-Zwick's concluded both businesses located in the same building would be a prudent business decision.

126. In January 2007, Mr. Wegman signed a lease with Ms. Grubbs and Tri-Serve moved to the Dry Fork Road location.

127. From December of 2006 through June of 2007, Ms. Grubbs and Ms. Strunk-Zwick worked together as the two companies worked together.

128. In May of 2007, Ms. Grubbs asked Ms. Strunk-Zwick if she knew who could assist her in running Capital Concepts.  Ms. Strunk-Zwick's responded: "What about me?"

129. Ms. Strunk-Zwick informed Ms. Grubbs, Ms. Strunk-Zwick had grown "tired of the PEO business and would like to learn about financial planning."

130. Ms. Grubbs decided to hire Ms. Strunk-Zwick as manager for Capital Concepts.

131. Ms. Strunk-Zwick immediately expressed an interest in purchasing shares in the Capital Concepts, Inc. The plan agreed to involve her to be acting CEO and own forty percent ownership of Capital Concepts in five years.  (She would never own a share of Capital Concepts.)

132. When Ms. Strunk-Zwick resigned from Tri-Serve to work for Capital Concepts, Mr. Wegman and Ms. Strunk-Zwick signed a new agreement which nullified the "Phantom Agreement."

133. The agreement effective July 1, 2007 between Ms. Strunk-Zwick and Mr. Wegman, removed all ownership rights of Ms. Strunk-Zwick in Tri-Serve except for a half ownership interest in the Benefits Brokerage. (Exhibit 35)

134. The agreement allowed Ms. Strunk-Zwick to maintain use of a vehicle, but the registration would be kept in Tri-Serve's name until the loan was paid off or she refinanced the loan in her name.

135. This agreement required Ms. Strunk-Zwick to make monthly payments of $575.09 to US Bank, maintain automobile insurance and add name Tri-Serve as additional insured.

136. From June 18, 2007 through June 30, 2007, Capital Concepts paid Ms. Strunk-Zwick a hourly wage. From July 1, 2007 through July 31, 2007 she was paid an amount equal to her future salaried wage while they finalized her contract.

137. Capital Concepts and Ms. Strunk-Zwick agreed to a total gross annual package of $56,280.00. She received a salary of $45,000.00, car allowance of $9,600.00 and a cell phone allowance of $1,680.00. The parties signed the employment agreement on August 1, 2007. (Exhibit 36)

138. The agreement allowed Ms. Strunk-Zwick to purchase shares of stock in Capital Concepts up to the previously mentioned forty percent.

139. Immediately upon hire, Ms. Strunk-Zwick changed the day to day operations of Capital Concepts. It is the allegation of Ms. Grubbs that Ms. Strunk-Zwick "marked" Ms. Grubbs as a vulnerable and susceptible victim of her planned financial scams.

140. Ms. Strunk-Zwick immediately moved Capital Concepts bank accounts from the small local bank of Harrison Savings and Loan to the larger US Bank.

141. Ms. Grubbs maintained an excellent relationship with Harrison Savings and Loan as a result of being a customer for over twenty years.

142. In June 2007, Ms. Strunk-Zwick held a meeting with Ms. Grubbs and Mr. Allen, now a Branch Manager at US Bank, to discuss the benefits of banking with a larger national bank.

143. Unknown to Ms. Grubbs, Mr. Allen was Ms. Strunk-Zwick's boyfriend and in public they were known as a couple. Ms. Strunk-Zwick or Mr. Allen never disclosed this fact to Ms. Grubbs.

144. At the end of June 2007, Ms. Strunk-Zwick and Mr. Allen facilitated the opening of new accounts with US Bank. Ms. Grubbs signed new signature cards for checking, money market accounts and a corporate credit card application.

145. On July 2, 2007, Mr. Allen filled out a Merchant Agreement form and faxed it over for Ms. Grubbs signature. Mr. Allen handled this transaction through Ms. Strunk-Zwick. (Exhibit 37)

146. On July 2, 2007, Mr. Allen filled out a loan application for a credit line and sent it to Ms. Strunk-Zwick for Ms. Grubbs signature. (Exhibit 38)

147.US Bank issued credit cards for Capital Concepts.

148.Ms. Strunk-Zwick began utilizing her credit card for personal expenses.  July 13, 2008 would be the first personal charge on the card.

149.Ms. Strunk-Zwick insisted Ms. Grubbs switch their accounting software from Peach Tree accounting to Quick Books. She argued Quick Books was more user friendly than Peach Tree.

150.Its standard knowledge Quick Books entries are more easily manipulated while Peach Tree entries were recorded on a time stamped basis.  Any adjustments were recorded and traceable on Peach Tree.

151.As part of her transition of employment to Capital Concepts, Ms. Strunk-Zwick contacted her long time friend Mr. Rodger Roeser and his public relations firm Eisen Management Group.

152.Ms. Strunk-Zwick previously introduced Eisen to Mr. Wegman and Tri-Serve. When Eisen began charging Mr. Wegman excessive fees, he reduced utilization of Eisen's services.

153.By July 2007, Ms. Strunk-Zwick had daily control of Capital Concepts.

154.Ms. Strunk-Zwick began embezzling from Capital Concepts from the outset.

155.Lynn Mattox had performed all the accounting for Capital Concepts including bookkeeping and client billing for Capital Concepts for many years.

156.During her nine years of employment with Capital Concepts, Ms. Mattox's work never resulted in any discrepancies with the financial reports.

157.Ms. Grubbs used to do the books herself too.

158.For twenty-three years, there were never any issues of concern about the financial reports.

159.During the first weeks of July 2007, Ms. Strunk-Zwick placed tremendous pressure on Ms. Mattox regarding allowing Ms. Strunk-Zwick to handle the bookkeeping duties.

160. Ms. Strunk-Zwick showed no patience with Ms. Mattox's training on Quick Books.

161. Ms. Strunk-Zwick, informed Ms. Grubbs the reason she wanted to perform the bookkeeping duties herself was because "it is easier to do the entries once myself, than to go back and correct someone else's mistakes."

162. The pressure from Ms. Strunk-Zwick created tension between her and Ms. Mattox. Toward the end of July 2007, Ms. Mattox got up, walked out, and quit Capital Concepts with no notice on anyone.

163. It was later discovered that Ms. Mattox quit because Ms. Strunk-Zwick intentionally drove her out of the company.

164. Upon Ms. Mattox's abrupt departure from Capital Concepts, Ms. Strunk-Zwick took over all the bookkeeping duties. As the only employee familiar with Quick Books, only she could maneuver around the program effortlessly.

165. On July 23, 2007, with the help of Mr. Dean Allen, US Bank funded the Capital Concepts credit line in the amount $40,000.00. The account number is 00003000056872. (Exhibit 39)

166. The sole purpose of this credit line was to remodel the garage at the Capital Concepts Harrison, Ohio location into an office.

167. An initial deposit was made to the contractor.

168. When Ms. Grubbs asked Ms. Strunk-Zwick if the contractor was being paid, she told Ms. Grubbs he was paid his initial deposit, but then lied to Ms. Grubbs and told her the credit line was not approved.

169. Ms. Grubbs then used personal funds in the amount of $40,000 to pay for the completion of the construction.

170. Ms. Strunk-Zwick embezzled money from the credit line into her personal accounts.

171. On August 7, 2007, an application for a service with US Bank called SinglePoint, was filled out in Mr. Allen's handwriting and signature forged by Ms. Strunk-Zwick. This forgery was later

verified by US Bank's own fraud department by Ms. Susan Wurzelbacher. (Exhibit 40)

172. SinglePoint gave Ms. Strunk-Zwick access to transfer funds via ACH. Automated Clearing House (ACH) is an electronic network for financial transactions in the United States. ACH processes large volumes of credit and debit transactions in batches.

173. Access to this ACH service permitted Ms. Strunk-Zwick to transfer money to her personal accounts with little effort. It also allowed her to pay her personal bills through Capital Concepts accounts.

174. Mr. Allen conspired with Ms. Strunk-Zwick to allow this to happen.  It is standard business practice in the banking industry for bank personnel to personally witness the signatures on these forms.

175. The above ACH documentation reveals Ms. Grubbs name and information is crossed out for administrator and Ms. Strunk-Zwick's information is written in its place.

176. As part of her role as a manager at Capital Concepts, Ms. Strunk-Zwick was to present the financial reports during their company meetings. According to the financials she produced everything always appeared in order.

177. According to Brett Horn, the years of 2007-2009 were down years in the financial market, so when the financials Ms. Strunk-Zwick presented were showing less than stellar results, no alarms went off.

178. On January 30, 2008, Ms. Grubbs borrowed from US Bank a loan in the amount of $4800.00 on behalf of Capital Concepts for the purchase of conference room furniture.

179. The Equipment Finance Agreement number is 85307, the Account number is 55000015970000. (Exhibit 41)

180. During 2008, Tri-Serve continued to produce a profit for Mr. Wegman and he built the business.

181. Ms. Strunk-Zwick claimed to Mr. Wegman Mr. Sacco, the owner of Pay Source, wanted to move his Ohio clients to Tri-Serve.

182. Ms. Strunk-Zwick continued to pursue the purchase of the Ohio clients on behalf of Tri-Serve and Capital Concepts.

183. Mr. Wegman recalled a low estimate for the number of clients was 100 which at minimum would have included 1000 employees.

184. It is Mr. Wegman's understanding Mr. Sacco, owner of PaySource, used a loophole within the laws of Unemployment Compensation with the State of Ohio.

185. This loophole allowed corporations to set up multiple "shell corporations."  These corporations would place all employees in one and let the "shells" sit on the books to earn a low unemployment rating.

186. Once the rate of the corporation the employees were placed into increased, he would then move them to one of the other "shell companies" and pay lower premiums. This same process would be repeated every few years between several companies.

187. The State of Ohio began to investigate the companies who used this loophole and the State of Ohio attempted to recover lost premiums from Mr. Sacco and PaySource.

188. It was not known at this time, but Mr. Sacco was also turning in false returns to the IRS and under reporting PaySource's income. (Exhibit 42)

189. During the summer of 2008, Ms. Strunk-Zwick forged a loan application and obtained a loan in the name of Capital Concepts from US Bank in the amount of $7623.00. (Exhibit 43)

190. The Equipment Finance Agreement number for Exhibit 43 is 8666597, account number 5500016136000, payment in the amount of $161.29 for fifty nine months.

191. This loan was used for furniture previously purchased by Capital Concepts as collateral. All funds from this fraudulent loan went directly for Ms. Strunk-Zwick's personal use.

192. In August of 2008, Mr. Wegman discussed with Ms. Strunk-Zwick that he was going to sell Tri-Serve. He was negotiating a price for sale with the Castle Group.

193. There were many hurdles at that point with regards to purchasing Mr. Sacco's PaySource's

clients and Mr. Wegman had an opportunity to purchase a softball park. Mr. Wegman, a top ranked softball player in the United States, chose to follow his softball passion so he sold Tri-Serve.

194. In August of 2008, Ms. Strunk-Zwick approached Ms. Grubbs with the idea of Ms. Grubbs purchasing Tri-Serve.

195. The two women discussed the purchase. They were already providing services to both companies' clients. Owning both companies would provide them with a better opportunity to improve services and maintain client loyalty.

196. Ms. Strunk-Zwick and Ms. Grubbs met with Mr. Wegman and presented their offer of a dollar more than The Castle Group's offer.

197. On August 29, 2008, the first of many payments to Frost, Brown and Todd were made from a Capital Concepts account. The charge dated August 29, 2008 is posted on September 02, 2008 for $1000.00. (Exhibit 44)

198. To this day, Ms. Grubbs has no idea what these payments were for. However, it's clear it involved legal services to Capital Concepts. These payments created an attorney client relationship between FBT and Capital Concepts and a fiduciary duty on behalf of FBT to Capital Concepts. These checks were accepted and cashed by Frost Brown Todd.

199. In the beginning of September 2008, Ms. Grubbs became so ill, the doctors admitted her into ICU where she remained for several weeks. Ms. Grubbs did not return to the office until the beginning of October.

200. On October 1, 2008, as discussions of the purchase of Tri-Serve progressed, Ms. Grubbs became aware of the agreement between Ms. Strunk-Zwick and Mr. Wegman with regards to the Toyota Solara titled in the name of Tri-Serve.

201. This vehicle became an issue for Ms. Grubbs. She told Ms. Strunk-Zwick she wanted the car refinanced and out of Tri-Serve's name.

202. On October 10, 2008, Mr. & Mrs. Grubbs signed signature cards to open new accounts for Tri-Serve with First Financial Bank.

24

203. Ms. Grubbs offered ownership in Tri-Serve to Ms. Strunk-Zwick. Ms. Grubbs believed Ms. Strunk-Zwick brought the expertise to run Tri-Serve.

204. Ms. Strunk-Zwick informed Ms. Grubbs she did not want signatory authority or ownership interest in TriServe. Unlike with Mr. Wegman and Mr. Allen, Ms. Strunk-Zwick and Ms. Grubbs did not have a phantom agreement.

205. On October 13, 2008, Ms. Grubbs signed a purchase agreement, promissory note and guaranty for the purchase of 100 percent ownership of all of Tri-Serve and its subsidiaries. (Exhibit 45)

206. Ms. Grubbs acquired the right to maintain the name of Tri-Serve and use its current EIN numbers until the end of 2008. Ms. Strunk-Zwick advised Ms. Grubbs to do this.

207. Ms. Strunk-Zwick informed Ms. Grubbs if she changed the company information as of October 13th all of the workers compensation and insurance would restart on the employees and would be a prohibitive expense.

208. A new Tri-Serve would be formed effective January 1, 2009.

209. Immediately upon purchase of Tri-Serve, Ms. Strunk-Zwick brought in Eisen and the decision was made to use the Tri-Serve "It's Done!" branding for TriServe.

210. Eisen was paid a significant amount of money to produce note pads, pens, leather binders, folders and other marketing materials with the Tri-Serve "It's Done!" branding.

211. When Mr. Wegman periodically stopped by TriServe to pick up various items after he sold TriServe, he noticed the large amounts of marketing material with the Tri-Serve "It's Done" branding.

212. Mr. Wegman made the comment to Brett Horn: "I bet that cost you a pretty penny, I know what they were going to charge me for using the "It's Done" marketing materials." The Plaintiffs paid for "It's Done!" They own "It's Done!"

213. In October of 2008, Mr. Wegman purchased Mid America Ballpark to pursue his interest in softball.

214. Based upon Mr. Wegman being the former owner of a PEO, Sheakley refused to provide insurance for Mid America Ballpark. This is one of the many facts supporting Sheakley had direct knowledge of Linda Grubbs now owning Tri-Serve. Mr. Wegman will testify to this fact.

215. During the month of November and the early part of December, Mr. Wegman noticed when he stopped at Tri-Serve Ms. Strunk-Zwick was not in the office.

216. Ms. Grubbs and Mr. Horn told Mr. Wegman that Ms. Strunk-Zwick was "working on a big client" from Dayton, Ohio for Tri-Serve and Capital Concepts. Mr. Wegman told Ms. Grubbs and Mr. horn it had to be Pay Source.

217. Mr. Wegman also explained to Ms. Grubbs and Mr. Horn if Tri-Serve and Capital Concepts purchased Pay Source or acquired their clients it would take to a much higher level of profitability.

218. On December 8, 2008, Ms. Grubbs signed the forms for the new corporation for Tri-Serve. An error on the year of the signature shows they were signed 12/29/09. They should show 12/29/08. (Exhibit 46)

219. These documents were signed on December 8, 2008 because Ms. Grubbs planned to have surgery later in the month of December and she wanted all documentation for Tri-Serve finalized.

220. On December 8, 2008, checks were issued and she placed all documentation in envelopes and placed in the mail bin to be sent to the Secretary of State for the State of Ohio for incorporation on the new Tri-Serve entities to be effective January 1, 2009.

221. On December 29, 2008, Federal Employer Identification Numbers, (FEIN aka EIN) were applied for and issued via the IRS website. (Exhibit 47)

222. Ms. Grubbs planned to be out of the office and working from home doing tax returns until the beginning of February 2009.

223. Upon Ms. Grubbs return to the office of Capital Concepts in February, she began asking questions of Ms. Strunk-Zwick about Tri-Serve.

224. She asked Ms. Strunk-Zwick if Mr. Wegman was being paid, asked her if she refinanced the

vehicle and asked to schedule meetings to sit down and go over financial statements.

225. Ms. Strunk-Zwick made evasive excuses about everything.  Ms. Grubbs decided to send emails to Mr. Wegman.  February 2009 would be the time Sheakley made their initial move on TriServe.

226. Unknown to Ms. Grubbs at the time, Ms. Strunk-Zwick developed a spreadsheet for liabilities payable for Tri-Serve which Ms. Strunk-Zwick claimed were the responsibility of Mr. Wegman.

227. This spreadsheet reflected Mr. Wegman owing Capital Concepts for payments Capital Concepts made Mr. Wegman.

228. Mr. Wegman rejected the assertions made by Ms. Strunk-Zwick and her spreadsheet.

229. Ms. Strunk-Zwick falsely blamed Ms. Grubbs to Mr. Wegman, called Ms. Grubbs "an old wench" and promised she had it all under control and would take care of it.

230. At this same time, Ms. Strunk-Zwick told Ms. Grubbs that Capital Concepts did not need to pay Mr. Wegman for Tri-Serve because he lied about the liabilities Tri-Serve owed.

231. Ms. Grubbs continued to pay Mr. Wegman for TriServe despite.

232. Every time Ms. Grubbs would email Mr. Wegman, Ms. Strunk-Zwick interceded by phone or email to Mr. Wegman addressing the issue. She blocked contact between Ms. Grubbs and Mr. Wegman.

233. Ms. Strunk-Zwick read everyone's email through the password protected server.  This gave her access to private information not intended for her to view.

234. On February 25, 2009, Mr. Bryan Bundy, President of Sheakley HR Solutions emailed Ms. Strunk-Zwick for assistance with their PEO division. (Exhibit 48)

235. He indicated in this email he knew Ms. Strunk-Zwick worked for both Capital Concepts and Tri-Serve, but he would appreciate any assistance she could give and he would pay her as a consultant.

236. These emails and meetings continued back and forth in the months of March and April with Ms. Strunk-Zwick meeting and being paid to do consulting work for Sheakley, while Capital Concepts paid her salary. Ms. Strunk-Zwick never disclosed this to Ms. Grubbs and Sheakley knew she didn't disclose it to Ms. Grubbs. (Exhibit 49)

237. On March 25, 2009, Ms. Strunk-Zwick suggested TriServe take over the payroll for the Sheakley PEO and relieve a very frustrated Bryan Bundy from his stress. (Exhibit 50)

238. Ms. Grubbs continued to question Ms. Strunk-Zwick about the refinancing of the vehicle.

239. On April 7, 2009, Ms. Strunk-Zwick met with Sheakley. It's unknown if this was the first meeting or not.

240. Beginning April 8, 2009, Ms. Strunk-Zwick began email correspondence with US Bank's Julie Forcier in regards to a loan to refinance the vehicle. (Exhibit 51)

241. Unknown to Ms. Grubbs, Ms. Strunk-Zwick sent US Bank forged documents to obtain this loan.

242. US Bank funded the loan in Capital Concepts name and left the vehicle titled in Tri-Serve's name, all without verification.

243. In order to obtain this loan, Ms. Strunk-Zwick stole Ms. Grubbs driver licence so she could provide a copy of Ms. Grubbs driver's license to US Bank.

244. US Bank permitted Ms. Strunk-Zwick to provide insurance on the vehicle, despite the loan being in Capital Concepts name and the title in Tri-Serve's name.

245. On April 10, 2009, US Bank funded Equipment Agreement Number 1128925, account number 5500026017000, for a Toyota Solara VIN number 4T1FA38P06U084411. (Exhibit 52)

246. This account paid off the previous loan for this vehicle with another division of US Bank. Ms. Strunk-Zwick used the proof of that payoff to satisfy Ms. Grubbs regarding the vehicle being refinanced and loan paid in full. She never informed Ms. Grubbs she had refinanced it in Capital Concepts name.

247. On April 13, 2009, Ms. Strunk-Zwick accepted a check in the amount of $5937.00 from Modern Office Methods ("MOM") as a payoff for the lease of another copier owned by Mr. Wegman with payments in his name.

248. Ms. Strunk-Zwick falsely listed herself as President of Tri-Serve on the Third Party Lease Settlement Agreement. (Exhibit 53)

249. She deposited this check into Tri-Serve's First Financial account and then into to Ms. Strunk-Zwick's personal account. (Exhibit 54)

250. On April 14, 2009, Mr. Wegman emailed Ms. Strunk-Zwick asking if she used Sheakley or someone else for a Third Party Administrator ("TPA"). He needed to find one and thought Sheakley may still deny him because he was the former owner of Tri-Serve. (Exhibit 55)

251. Ms. Strunk-Zwick entered into a purchase agreement on April 30, 2009, with MOM. The financing was assigned to Wells Fargo Bank. (Exhibit 56)

252. Ms. Strunk-Zwick fraudulently executed the document listing her self as President of Capital Concepts. This loan contract number is 0010071217001, in the amount of $20,684.40 for a Lanier LD528c printer/copier/scanner.

253. Ms. Grubbs questioned Ms. Strunk-Zwick as to why Capital Concepts employees had not been crossed trained with TriServe.

254. Ms. Strunk-Zwick never took Brett Horn on sales calls as agreed so he could learn the PEO business. She would always come up with an excuse.

255. Ms. Strunk-Zwick did not take Brett Horn because she met with Sheakley and took Sheakley personnel on sales call with her and obtain new clients for Sheakley. Sheakley would benefit from these sales calls on Capital Concepts "dime."

256. In April 2009, Ms. Strunk-Zwick became noticeably absent from the office by everyone at TriServe and Capital Concepts. At this time, she worked with Sheakley and told Ms. Grubbs she worked on obtaining a new client for Tri-Serve and Capital Concepts.

257. Due to Ms. Strunk-Zwick's lack of presence in the office and Ms. Grubbs asking questions about Tri-Serve, tension increased between the two women as evidenced in a May 6, 2009

email between Ms. Strunk-Zwick and Ms. Grubbs. (Exhibit 57)

258. Ms. Strunk-Zwick continuted her lies and kept her web of deceit by playing everyone against each other.

259. Due to her physical absence from the Capital Concepts office, it was necessary for others to work at Ms. Strunk-Zwick's desk. During one of those occasions, the envelope that had been addressed to the State of Ohio with all Tri-Serve's incorporation paperwork was discovered in her desk by Ms. Grubbs. It had never been sent.

260. Ms. Grubbs asked Ms. Strunk-Zwick about it and Ms. Strunk-Zwick claimed she sent in other copies to the State and that is why the file was still in her desk.

261. Pursuant to the State of Ohio website, Ms. Strunk-Zwick did not file the paperwork on any of the Tri-Serve companies until May 18, 2009 and wrote in an effective date of June 01, 2009 rather than January 01, 2009. Since Ms. Strunk-Zwick never filed these papers prior to December 31, 2008, Plaintiffs allege a conspiracy with Strunk-Zwick and Sheakley Defendants which began, known at the time, prior to January 1, 2009.

262. Ms. Grubbs believed Ms. Strunk-Zwick planned to leave her companies.

263. Ms. Grubbs' attorney, Ms. Jennifer Wolf, reviewed the documents regarding the purchase of Tri-Serve on the issue of whether or not Mr. Wegman should not be paid.

264. Ms. Wolf told Ms. Grubbs she saw no valid reason for not honoring the contract with Mr. Wegman.

265. On May 27, 2009 at 2:00 PM, Ms. Strunk-Zwick, Larry Sheakley and Steve Wolf met. Discovery, subpoenas and depositions will aid in the details of these meetings.

266. Ms. Strunk-Zwick began discussions with Mr. Steve Wolf about moving "her company and clients" to Sheakley. Mr. Wolf was being considered for the position of Vice President of Sales for Sheakley HR. Sheakley and Wolf knew Ms. Strunk-Zwick did not own TriServe and Capital Concepts.

267. On June 2, 2009, according to Ms. Strunk-Zwick's calendar she and Larry Sheakley met at 9:00 a.m.

268. Ms. Strunk-Zwick and Larry Sheakley planned for Ms. Strunk-Zwick, Ms. Fernbach and Ms. Kimberly Martin to join Sheakley not as a normal personal "steal," but a full blown steal all of TriServe.

269. Ms. Strunk-Zwick planned to sell a company she did not own, Tri-Serve, to Larry Sheakley. Larry Sheakley planned to buy a company from someone he knew did not own it.

270. On June 3, 2009, Ms. Strunk-Zwick was absent all day from the office of Capital Concepts.

271. Between the months of May, June and July of 2009, Sheakley illegally obtained confidential, proprietary client and business information owned by Ms. Grubbs from Ms. Strunk-Zwick, Ms. Martin and Ms. Fernbach.

272. Larry Sheakley and Ms. Strunk-Zwick planned for her to join Sheakley on June 26, 2009. They moved this date first to July 2, 2009 then finally to July 6, 2009.

273. In a June 3, 2009 email from Ms. Strunk-Zwick to Matt Sheakley, she stated she just closed a deal that morning.  She took Mr. Wolf with her to show her the ropes.  She stated the client wanted to begin as soon as possible and she thought it would be best if they began with Sheakley, but she wanted to run some things by Matt Sheakley.  (Exhibit 58)

274. Prior to the theft of Tri-Serve, several large clients signed up by Tri-Serve were either placed into the Tri-Serve group with the intention they would be moved immediately to Sheakley or signed directly to Sheakley.

275. While the thieves were thieving for the benefit of, knowledge of  and assistance of Larry Sheakley, Ms. Strunk-Zwick was being paid by Ms. Grubbs and Capital Concepts and Ms. Martin and Ms. Fernbach were being paid by Tri-Serve.  Larry and Matt Sheakley acted with intent to defraud Plaintiffs.

276. In a June 3, 2009, email from Matt Sheakley to Steve Wolf, Matt Sheakley asked for Mr. Wolf to forward an email to Ms. Strunk-Zwick about underwriting for healthcare coverage. (Exhibit 59)

277. In a June 4, 2009 email from Ms. Strunk-Zwick to Mr. Wolf, she submitted Mr. Allen's resume for a PEO sales position with Sheakley. (Exhibit 60)

278. In a June 4, 2009 email from Matt Sheakley to Mr. Wolf, Matt Sheakley requested Mr. Wolf to forward an email to Ms. Strunk-Zwick regarding the PEO Plan Options.  (Exhibit 61)

279. On June 5, 2009, Ms. Strunk-Zwick was absent all day from the office of Capital Concepts.

280. On June 6, 2009, Ms. Strunk-Zwick sent an email to Brett Horn asking for a payoff on the balance of the US Bank Loan.

281. In June 7, 2009 emails between Mr. Wolf and Ms. Strunk-Zwick they discuss the proposal he presented to Matt Sheakley and Larry Sheakley regarding Ms. Strunk-Zwick's employment with Sheakley. They discuss salary and whether she wanted to keep the car from Tri-Serve.(Exhibit 62).

282. On June 8, 2009, Ms. Strunk-Zwick was again absent all day from the office of Capital Concepts.

283. According to the June 10, 2009 emails from Mr. Wolf to Ms. Strunk-Zwick, Mr. Wolf requested Ms. Strunk-Zwick put together an office structure organizational chart for his meeting with Larry Sheakley. This email also refers to the fact Ms. Strunk-Zwick plans to place new clients with "Tri-Serve and we'll go from there." (Exhibit 63)  Sheakley and Strunk-Zwick did a merger, without an owner, an asset sale, without an owner, and both without playing the owner a dime.

284. On June 11, 2009, Ms. Strunk-Zwick and Larry Sheakley met at 10:30 a.m.

285. In a June 11, 2009 email between Matt Sheakley, Ms. Strunk-Zwick and Mr. Wolf there is discussion regarding a workers compensation question on Sheehan Pools, a Tri-Serve client. (Exhibit 64)

286. On June 11, 2009, Ms. Strunk-Zwick met with Ms. Fernbach and Ms. Martin at 1:30 PM.

287. An email on June 15, 2009 email from Ms. Strunk-Zwick to Matt Sheakley stated only "It's Done" and she was available to meet any day.  (Exhibit 65)  It's Done.  Sarcasm in conspiracy. The theft was done.  It was time to finish off Linda Grubbs.

288. At 11 am on June 15, 2009, Ms. Strunk-Zwick, Ms. Grubbs and Mr. Grubbs met to discuss Tri-Serve financial statements.

289. A June 16, 2009 email from Ms. Strunk-Zwick to Matt Sheakley discussed another new client she obtained. (Exhibit 66)

290. It is important to note that Ms. Strunk-Zwick never added a new client to the books of Tri-Serve. Any clients referenced here were placed directly onto Sheakley's books. During her final months masquerading as a Capital Concepts employee, Ms. Strunk-Zwick and Sheakley worked together to cause maximum damage to Ms. Grubbs and maximum benefit to Sheakley.

291. Ms. Martin and Ms. Fernbach agreed to keep information confidential in exchange for a job with Sheakley.

292. On June 16, 2009, Ms. Strunk-Zwick had lunch with Ms. Martin and Ms. Fernbach, Ms. Strunk-Zwick explained they were leaving and going to Sheakley.

293. Ms. Strunk-Zwick told Ms. Martin and Ms. Fernbach that Ms. Grubbs knew about the move, did not want anyone to know Capital Concepts was closing and the other employees would be losing their jobs. However, both Ms. Martin and Ms. Fernbach knew Ms. Strunk-Zwick and Sheakley did not have the authority to do that which they were doing.

294. On June 18, 2009, there was a meeting between Ms. Strunk-Zwick, Mr. Wolf and Matt Sheakley.

295. During this time Ms. Fernbach confided in Mr. Ellison, Ms. Grubbs longtime assistant, about the "merger." Ms. Fernbach asked Mr. Ellison to keep it confidential. He did.

296. A June 19, 2009 email between Mr. Bundy and Ms. Strunk-Zwick evidenced a quote for healthcare for a new client, Financial Relief Associates. (Exhibit 67)

297. There is an email from Ms. Strunk-Zwick to Mr. Wolf about speaking with Mr. Wanner and "feeding him a line of BS," because he was dissatisfied with Sheakley's workers compensation program. This indicates her transitioning these clients directly to Sheakley. (Exhibit 68) During February through June 2009, the Sheakley Defendants knew Ms. Strunk-Zwick was working for Capital Concepts and TriServe and being paid by them and all the while they were "thieving."

298. Ms. Strunk-Zwick emailed Mr. Bundy on June 19, 2009 stating she is "talking to Mr. Sacco now." (Exhibit 69)

299. There are June 19 through June 21, 2009 emails between Ms. Strunk-Zwick and Mr. Wolf about transitioning clients smoothly, that Matt Sheakley said this is a top priority, and how great it was to hear about PaySource. (Exhibit 70)

300. A June 22, 2009 email from Ms. Strunk-Zwick to Ms. Fernbach, asked Ms. Fernbach what her thoughts are about the move to Sheakley. (Exhibit 73)

301. A June 22, 2009 email from Ms. Strunk-Zwick to Mr. Bundy requested corporate benefits information for "her staff." (Exhibit 74)

302. On June 23, 2009, Ms. Strunk-Zwick is absent again all day from the office of the Capital Concepts.

303. Mr. Bundy emailed Ms. Strunk-Zwick on June 23, 2009 requesting "CSA information needed" for clients she will be "bringing over." (Exhibit 75)

304. Mr. Bundy requested workers compensation information from Ms. Strunk-Zwick on June 23, 2009 for any of "her" clients they may want to put into Sheakley's workers compensation group. (Exhibit 76)

305. On June 23, 2009, Ms. Strunk-Zwick forwarded the email sent from Mr. Bundy to Ms. Martin and requested her to put together a spreadsheet for all clients. (Exhibit 76)

306. Ms. Martin responded on June 30, 2009 and pointed out they signed a contract for workers compensation with the NFIB (National Federation of Independent Businesses),

307. Ms. Martin asked Ms. Strunk-Zwick if they will be honoring the contract or now that we "ARE SHEAKLEY," does that make the contract invalid. "Our new groups start tomorrow." July 1, 2009 is "tomorrow." (Exhibit 77)

308. Ms. Strunk-Zwick emailed Matt Sheakley to ask specifically about certain salary arrangements, a COBRA payment and vacation time for Ms. Fernbach. All requests were honored by Matt Sheakley. (Exhibit 78)

309. In a July 24, 2009 email from Mr. Bundy to Ms. Strunk-Zwick, he requested her client list so he can pass it on to their representatives. (Exhibit 79)

310. On June 24, 2009, Mr. Bundy requested Ms. Surkamp to "forward the tax ID#'s for each SHRS company to Angelia Strunk for Darwin integration." (Exhibit 80)

311. Darwin is a software solution designed specifically to meet the unique needs of the Professional Employer (PEO) and Administrative Services (ASO) Organizations.

312. In her June 24, 2009 email, Ms. Strunk-Zwick sent a request to Ms. Martin to fill out the attached application and go online and complete paperwork for Sheakley. She informed Ms. Martin she will be receiving an "offer" and to review it. (Exhibit 81)

313. On June 24, 2009, Ms. Fernbach forwarded a spreadsheet of client information to Ms. Strunk-Zwick who then forwarded this proprietary Tri-Serve client information to Mr. Bundy.  (Exhibit 82)

314. Exhibit 82 included all TriServe client company and contact information, workers compensation codes, client billing information, and other additional information. This was sent to Sheakley without the direct knowledge or consent of the owner of Tri-Serve and was done while being compensated by Ms. Grubbs.  The Sheakley Defendants had an obligation to verify the owner consented to this disclosure.  They did not verify because thieves don't verify.

315. In her June 24, 2009 email to Mr. Bundy, Ms. Strunk-Zwick proved she is out making sales calls with Sheakley, while being paid by Ms. Grubbs to solicit these same clients for Tri-Serve.

316. In this email, she asked Mr. Bundy to stop a "sales guy" from the office H and H Industries, because that is the company she and Mr. Wolf just left. (Exhibit 83)

317. On June 24, 2009, Larry Sheakley, Ms. Strunk-Zwick, Mr. Bundy, Matt Sheakley and Mr. Wolf met to discuss the theft of Tri-Serve from its owner Ms. Grubbs.

318. On June 24 through June 25, 2009 there are several emails back and forth from Ms. Surkamp to Ms. Strunk-Zwick regarding the Sheakley tax ID numbers, previously requested in exhibit 80. Ms. Surkamp provided the Sheakley ID numbers and Ms. Strunk-Zwick requested "the associated state withholding and UI account numbers and UI rates." (Exhibit 84)

319. The next set of emails from June 25 through June 30, 2009 involved many vice presidents within Sheakley: Ms. Elyse Schulkers, Mr. John Dunn, Ms. Angelia Wright. All emails discuss the workers compensation proposal for H and H Industries. (Exhibit 85)

320. One email priced a client for Ms. Strunk-Zwick that she forwarded to Sheakley with an email signature that clearly stated "TriServe, LTD a subsidiary of Capital Concepts, Inc." Larry Sheakley and his entire team knew Ms. Strunk-Zwick was selling that which she did not own. Countless emails received by the Sheakley Defendants had this same signature: "TriServe, LTD a subsidiary of Capital Concepts, Inc."

321. Ms. Strunk-Zwick sold several clients prior to July 6, 2013 while working for Tri-Serve, yet their monetary benefit was never recognized by Tri-Serve, Ms. Grubbs or Capital Concepts. Yet, Ms. Grubbs financed the generation of the clients. The Sheakley Defendants knew this fact.

322. A June 25, 2009 notification to Matt Sheakley and Larry Sheakley by Ms. Strunk-Zwick stated that as of that day she did not have everything she needed to transition Tri-Serve's clients over and they will not be ready for Monday June 29, 2009.(Exhibit 86)

323. In this same email, Ms. Strunk-Zwick gave notice the transition will hopefully be completed by July 6, 2009.

324. In his June 25, 2009 response to Ms. Strunk-Zwick about moving the start date, Mr. Bundy attempted to reassure her most things were put in place or well on their way to completion and he still believed they can make the June 29, 2009 date. (Exhibit 87)

325. **Mr. Larry Sheakley** responded to Ms. Strunk-Zwick on June 25, 2009 and made it clear he "made it my top priority to get this PEO moving." (Exhibit 88)

326. **Larry Sheakley** also expressed "**WHATEVER YOU NEED** to get **your** business moved over and **our new business** implemented we will do." Larry Sheakley knew this business was Linda Grubbs business not Ms. Strunk-Zwick's. He also wanted it completed and completed now.

327. **Larry Sheakley** continued to write "Whatever **WE** are not doing **I** want to know **NOW** and I will find someone who wants to do it!!!!!" Greed was calling.

328. Larry Sheakley could not wait to complete his theft of Tri-Serve, its clients and all the proprietary information and intellectual property including "It's Done!"

329. Ms. Strunk-Zwick and Mr. Bundy continued to show disappointment the theft of Tri-Serve did not meet the anticipated target date of completion of June 29, 2009 (Exhibit 89)

330. Larry Sheakley reprimanded Mr. Bundy in this June 25, 2009 email: "U had my authority to use whoever in the building you needed to do it", continuing to say "I have given my word so **I want to be kept informed**." "If ANGELIA has given us a list of to do's then let's ck em off and what we don't have done let's get done!!" (Exhibit 90).  Of course Angelia and Larry were on a first name basis.

331. On June 26, 2009, Ms. Strunk-Zwick transferred a PTS Import file to J Walker with Sheakley. This import file contains proprietary Tri-Serve client information, as well as Capital Concepts proprietary coded information. (Exhibit 91)

332. This file is intended as software coding for integration into Sheakley's system. "PTS" is known as "Pro Tools Session," The *pts file* format is designed to store point clouds in a simple, human readable way. Each point is stored as a couple of values in one line of the *pts file*.

333. In a separate emails regarding information in exhibit 91, J Walker forwarded PTS test file to Mr. Weber who then forwarded to Sharon Jett and Stephanie Parker of Sheakley's payroll division Pay Systems on June 26, 2009. (Exhibit 92)

334. Mr. Weber requested they "test the PTS file to see if it can be imported to MasterTax." Ms. Jett informed Mr. Weber the import worked and they just need to set those companies up so they can tell more about the tax codes.

335. Ms. Strunk-Zwick emailed an update to Larry Sheakley on June 26, 2009 informing him she "met with various people today and they are moving forward in getting the information together to move." (Exhibit 93)

336. Ms. Strunk-Zwick also stated "I will be there for sure on July 6, but next week to run our first payroll on July 1!"  The excitement of the theft completion was building to a crescendo.

337. On June 26, 2009, Ms. Surkamp and Ms. Strunk-Zwick began email correspondence for the formatting of Sheakley bank account numbers. (Exhibit 94)

338. Ms. Surkamp forwarded Sheakley's bank account numbers to Ms. Strunk-Zwick along with "batch headers for both accounts" and a bmp format of Larry Sheakley's signature.

339. This information is required so that upon Ms. Strunk-Zwick's start date the system will be formatted to specific standards so payroll can be run properly.  Larry Sheakley had the signatory authority on these bank accounts which provide payroll for employees and client

account payroll.

340. Ms. Fernbach sent Mr. Weber the ASO reports he requested from Ms. Strunk on June 26, 2009. Mr. Weber proceeded to inform Ms. Strunk-Zwick they cannot add Soul Enterprises dba Spa 413 because their FEIN number showed inactive. (Exhibit 95)

341. This exhibit will be later referenced when Ms. Strunk-Zwick sent Mr. Weber Tri-Serve's link to MasterTax.

342. Ms. Surkamp sent Ms. Strunk-Zwick "Batch Header" information for the ACH setup from the Darwin system for payroll on June 26, 2009. (Exhibit 96)

343. Ms. Strunk-Zwick requested and received a template proposal from Ms. Fair on June 26, 2009 for Ms. Strunk-Zwick to send to H and H Industries for their PEO services. (Exhibit 97)

344. Ms. Strunk-Zwick customized the proposal from exhibit 97 and sent to L. Hickman with H and H Industries on June 26, 2009. (Exhibit 98)

345. This proposal is sent from Ms. Strunk-Zwick using her email address with Tri-Serve, owned by Ms. Grubbs, but emailed on behalf and for the sole benefit of Sheakley.

346. Ms. Grubbs unknowingly paid for Sheakley to collect fees from and make profit from this client intended for Tri-Serve.

347. Over this late June weekend, Ms. Strunk-Zwick hosted a graduation party for her daughter Kaitlyn from High School. Mr. Horn and Mrs. Wegman were in attendance and gave gifts for Ms. Strunk-Zwick's daughter. Neither knew what Ms. Strunk-Zwick was up to.

348. Ms. Strunk-Zwick maintained her "image" as a dedicated and loyal employee of Capital Concepts and manager for TriServe as well as good friend of Ms. Grubbs and Brett Horn as she plotted to destroy them. Ms. Grubbs will testify Ms. Strunk-Zwick had become like her family.

349. Mr. Weber forwarded the ASO information from exhibit 95 to Ms. S. Parker with Sheakley's Pay System on June 29, 2009 stating clients will be set up as any other company, using their state and federal account numbers, but assigned to Sheakley Managed Services Group. (Exhibit 99)

350. On June 29, 2009 at 2:30 PM, Ms. Grubbs, Mr. Wegman and Ms. Strunk-Zwick had a meeting regarding Tri-Serve.

351. Ms. Parker informed Mr. Weber she used the reporting payroll number as the client number in MasterTax and asked if that is correct.

352. Mr. Weber continued to state "since the processing for these companies is on a different system, and we will be exporting files from that system, it makes sense to do what you did." This referenced the transition of Tri-Serve clients to Sheakley's internal formatting.

353. Ms. Strunk-Zwick emailed Ms. Jayne Gaffney with Sheakley on June 29, 2009 regarding Tri-Serve's 401K plan with John Hancock. She asked Ms. Gaffney if John Hancock can still manage their plan and asked her to review their fees versus the fees with Sheakley's plan. (Exhibit 100)

354. On June 29, 2009, Ms. Dana Hutchison of Sheakley forwarded to Ms. Fair, who then forwarded to Ms. Strunk-Zwick, the list of extension, direct dial numbers and network logins for the new team members from Tri-Serve including Mr. Wolf.  (Exhibit 101)

355. Ms. Gaffney responded to Ms. Strunk-Zwick's email, exhibit 100, on June 29, 2009 stated the existing plan can stay in place until January 1, 2010. (Exhibit 102)

356. Ms. Gaffney informed Ms. Strunk-Zwick the "login" does not provide the internal fee information and Ms. Gaffney informed her she sent an email to Maria with John Hancock requesting information.

357. Ms. Gaffney advised Ms. Strunk-Zwick she would need to email Maria and approve her providing confidential Tri-Serve client plan information to Ms. Gaffney.

358. On June 29, 2009, Mr. Bundy forwarded Tri-Serve's client list, of which many are mutual Capital Concepts clients, to Sheakley's sales staff and Matt Sheakley. This list became a do not call list for now for his sales people. (Exhibit 103)  Why?  Because they knew calling them before the theft would alert the Plaintiffs.  This is yet another fact proving the knowledge of wrongdoing by the Sheakley Defendants.

359. Ms. Strunk-Zwick requested information from Sheakley regarding an unemployment claim question. This email was sent to Mr. Bundy on June 29, 2009 who forwarded it to Mr. Weber. (Exhibit 104)

360. Ms. Strunk-Zwick emailed Ms. Martin and Ms. Fernbach regarding their move to Sheakley beginning next week on Monday June 29, 2009. It discussed additions to their offers of employment from Sheakley. (Exhibit 105)

361. Ms. Strunk-Zwick asked Matt Sheakley if they can put H and H Industries into Tri-Serve's workers compensation policy number 1280389. Have "Sheakley take over that policy and put them in," if it is possible "what would the rates be and how long will they be valid for?" (Exhibit 106)

362. Ms. Strunk-Zwick requested a few items from Matt Sheakley in her June 29, 2009 email. She asked about Ms. Fernbach's COBRA and vacations and requested she be able to keep her monthly individual health premium of $138.46 versus Sheakley's $400 per month. (Exhibit 107)

363. Ms. Strunk-Zwick's sent approval to Maria with John Hancock, in response to Ms. Gaffney's request in exhibit 102, to discuss Tri-Serve's 401K. (Exhibit 108)

364. Matt Sheakley sent approval in this June 30, 2009 email for Ms. Strunk-Zwick's additional offer requests from exhibit 107. (Exhibit 109)

365. As is discovered later by the United States Secret Service, Ms. Strunk-Zwick filed bankruptcy on June 30, 2009. This date was six days before her officially joining Sheakley.

366. Ms. Eleni Liston emailed Ms. Strunk-Zwick her revised Offer of Employment on June 30, 2009. It added her new hire date from June 29, 2009 to July 2, 2009; new Non-Solicitation Agreement dated July 2, 2009 and added her three weeks of vacation and payment of independent health premiums. (Exhibit 110)

367. On June 30, 2009, Ms. Liston sent Ms. Fernbach an email regarding her revised Offer of Employment. It changed her employment date from June 29 to July 2, 2009 and added her week of vacation and her COBRA premiums for medical and dental. (Exhibit 111)

368. Ms. Liston emailed Ms. Martin her revised offer of employment, only needing to change her hire date as well from June 29 to July 2, 2009. (Exhibit 112)

369. Ms. Martin, per Ms. Strunk-Zwick's request sent Ms. Surkamp of Sheakley, Tri-Serve's latest invoices received and paid to MasterTax and Davison. (Exhibit 113)

370. Both invoices clearly document Brian Wegman as the contact, not Ms. Strunk-Zwick. They also reflect the enormous amount of investment Ms. Grubbs paid to Wegman on a regular basis since her purchase of Tri-Serve.

371. Ms. Surkamp thanked Ms. Strunk-Zwick on June 30, 2009 for her G/L (general ledger) entry last Friday (June 26, 2009). She requested an example of a payroll journal entry and a report from Tri-Serve's payroll system providing a G/L mapping for Tri-Serve's earning and deduction codes. (Exhibit 114)

372. In this email Ms. Surkamp also referenced Mr. Weber received the MasterTax set up from Ms. Strunk-Zwick this morning, June 30, 2009 for the HRO, Human Resources Outsourcing, clients of Tri-Serve.

373. Ms. Surkamp asked Ms. Strunk to please produce the same information for the PEO clients.

374. Ms. Strunk-Zwick sent Mr. Weber Tri-Serve's login to MasterTax on June 30, 2009. This gave Mr. Weber and Sheakley the ability to retrieve and steal any of Tri-Serve's proprietary client and business information from their MasterTax account, which is owned and paid for by Ms. Grubbs and Capital Concepts. (Exhibit 115)

375. Ms. Martin responded on June 30, 2009 to Mr. Bundy with the information he requested from Ms. Strunk-Zwick in exhibit 76 for Tri-Serve's workers compensation information. (Exhibit 116)

376. In a continuation of Exhibit 116, Ms. Strunk and Mr. Bundy discussed leaving the Tri-Serve clients in the workers compensation groups they are currently in until the CR (compensation rate) policy is built. (Exhibit 117)

377. Ms Strunk-Zwick sent the previously requested G/L codes for Tri-Serve to Ms. Surkamp in this June 30, 2009 response. Ms. Surkamp requested the need for the G/L mapping for the earning codes for Tri-Serve. (Exhibit 118)

378. Ms. Strunk-Zwick sent the login information to Mr. Rob Aycock of Sheakley's IT (information technology) department for the website hosting and email of Tri-Serve. This information is forwarded on June 30, 2009 to insure their leads from the Tri-Serve website and all emails to the Tri-Serve server are forwarded to Ms. Strunk-Zwick's new Sheakley location. (Exhibit 119)

379. Ms. Strunk-Zwick forwarded two handbooks she would like implemented from Financial

Relief Advocates and REV Media, aka as FRA/REV, two business in the same location to Ms. Fair on June 30, 2009. (Exhibit 120)

380. The original email regarding one of these changes was sent on June 18, 2009 from Laura Harden from FRA to Ms. Strunk-Zwick's email at Tri-Serve.

381. Ms. Walker of Pay Systems sent Ms. Surkamp a sample of a positive pay file to be forwarded to Ms. Strunk-Zwick at Tri-Serve. The sample was from the Darwin system on June 30, 2009. (Exhibit 121)

382. This sample allowed them to set up Tri-Serve clients in the proper format.  Without this sample, the transition for the Tri-Serve clients into Sheakley's system would be much more difficult for Ms. Strunk-Zwick and Sheakley collectively to steal from Tri-Serve.

383. On July 1, 2009, Ms. Strunk-Zwick, Ms. Fernbach and Ms. Martin have a private two hour meeting.

384. On July 1, 2009 Ms. Fair requested some additional physical set up from Ms. Sandra Day and Ms. Conni Pennock from Sheakley internal mail department. They requested for all work to be completed by Monday July 6, 2009. (Exhibit 122)

385. Ms. Strunk-Zwick planned a "field trip" to Sheakley with Ms. Fair for the benefit of Ms. Fernbach and Ms. Martin. She planned this on July 1 for a "field trip" date of July 2, 2009 at 9:30 am. (Exhibit 123)

386. Ms. Strunk-Zwick told Ms. Grubbs she would be taking the ladies out for lunch.  They left on July 2, 2009.

387. This "field trip" to their new job was paid for by Ms. Grubbs, Capital Concepts and Tri-Serve.

388. Mr. Weber requested information from Ms. Strunk-Zwick on July 1, 2009 regarding Tri-Serve clients. He asked if any of those clients have corporate officers, and needs her to send the information on those particular companies. He also stated the last login for MasterTax did not work for him. (Exhibit 124)

389. Ms. Strunk-Zwick forwarded a link and Tri-Serve's login for FW Davison. This gave access to Ms. Surkamp and Sheakley for Tri-Serve's HR Pyramid account.  (Exhibit 125)

390. Ms. Strunk-Zwick requested Sheakley's fractional transit number from Ms. Surkamp on July 1, 2009; this allowed her to set up Sheakley's banking information to receive client's payments and to produce checks on behalf of Tri-Serve clients. (Exhibit 126)  All of these codes, passwords, software and information were an are the property of Plaintiffs and Sheakley Defendants knew it.

391. On July 1, 2009, Ms. Grubbs emailed Ms. Wolf's reply to calm Ms. Strunk-Zwick's insistence that Ms. Grubb's does not need to pay Mr. Wegman for Tri-Serve. Ms. Strunk-Zwick continued to maintain Mr. Wegman breached his contract. (Exhibit 127)

392. In her response to Ms. Grubbs, Ms. Strunk-Zwick delineated two paragraphs in the purchase agreement which she felt supported her case. She has invented reasons for Mr. Wegman to owe Capital Concepts, and her plan to fall apart as Ms. Grubbs and Mr. Wegman communicate with each other.

393. Ms. Strunk-Zwick sent Ms. Surkamp the NACHA file on July 1, 2009, requested she test it and made sure the headers worked.  It is for Tri-Serve's PEO employee DD (direct deposit) file. Ms. Strunk-Zwick stated she will send the other three. (Exhibit 128)

394. They sent all these files using either a Tri-Serve or Capital Concepts email owned by Ms. Grubbs.

395. There is also a second request by Ms. Strunk for Mr. L. Sheakley's signature file, which Ms. Surkamp honored and sent to Ms. Strunk-Zwick on July 1, 2009 after Ms. Strunk-Zwick forwarded Ms. Surkamp coded files with Tri-Serve's HRO PPD information. (Exhibit 129)

396. Ms. Surkamp responded to Ms. Strunk-Zwick regarding the NACHA file she sent her to test and states she tried to import this on the PNC website and it states the company ID is missing or invalid. (Exhibit 130)

397. Mr. Bundy sent a confirmation on July 1, 2009 to Matt Sheakley, Larry Sheakley and Ms. Strunk-Zwick that everything is in place for Monday's start date. He stated they have Building and Maintenance and IT in place for everything they need, and they are all set.   (Exhibit 131)

398. Ms. Strunk-Zwick sent the first of a series of emails to Tri-Serve "special" clients, this one to Ms. Hickman of H and H Industries, that Tri-Serve will be moving their offices over the weekend, giving her direct dial number and email at Sheakley. This is sent from her Tri-Serve email on July 2, 2009.  (Exhibit 132)

399. Mr. Grubbs came into the office on July 2, 2009 and noticed Ms. Strunk-Zwick removing files and cleaning out desks. Ms. Strunk-Zwick told Mr. Grubbs she was removing files for storage in her garage, so that they could clean up the office space.

400. Ms. Fernbach and Ms. Martin assisted Ms. Strunk-Zwick with the "clean up" and removal of the Tri-Serve files on July 2, 2009.

401. Ms. Strunk-Zwick expressed to Mr. Grubbs she felt the office was collecting clutter and she felt they would work more efficiently in a cleaner less cluttered work environment.

402. Ms. Strunk-Zwick forwarded another file to Ms. Surkamp with Tri-Serve client information on July 2, 2009 and Ms. Surkamp responded "it worked!" (Exhibit 133)

403. Ms. Strunk-Zwick's increased absence from the office and lack of communication with Ms. Grubbs regarding her activities gave Ms. Grubbs an increased level of anxiety.

404. On July 3, 2009, Ms. Grubbs spoke with Ms. Strunk-Zwick discussed her concern with Ms. Strunk-Zwick planning to leave.

405. Ms. Strunk-Zwick told Ms. Grubbs that Larry Sheakley presented her with an offer, but she had not made her decision as to what she was going to do.  She told Ms. Grubbs she would let her know.

406. Ms. Grubbs felt more uneasy about the situation with Ms. Strunk-Zwick after their conversation.  Ms. Grubbs went to First Financial Bank with Mr. Grubbs to check on their balances as she left for her scheduled conference out of town.

407. To her amazement, neither Ms. Grubbs nor her husband Larry, were listed as signors on the Tri-Serve accounts. She produced the documentation to add herself and her husband to the First Financial account and remove the signatory ability of Ms. Strunk-Zwick.

408. Not only did Ms. Strunk-Zwick not turn in the signature card to First Financial with Ms. Grubbs and her husband as signors, Ms. Strunk-Zwick was a signor on the account, and she never removed Mr. Wegman.

409. Ms. Grubbs had a yearly conference scheduled for the upcoming week and the office of TriServe and Capital Concepts was closed for the July 4th holiday during the days of July 3

44

through Monday morning July 6, 2009.

410. Ms. Strunk-Zwick requested Ms. Martin cancel their water service with Crystal Springs on July 3, 2009. (Exhibit 134)

411. On July 3, 2009 at 12:38 p.m. Ms. Strunk-Zwick sent the first of several emails to each and every Tri-Serve client informing them Tri-Serve was merging with Sheakley. The Sheakley Defendants knew Ms. Strunk-Zwick did not own Tri-Serve.  (Exhibit 135)  Of course, the owner of Tri-Serve and Capital Concepts, Linda Grubbs, had never agreed to a merger and did not know of the "merger."

412. Ms. Strunk-Zwick falsely stated in this email that Tri-Serve is "partnering with Sheakley HR and moving our offices" in order to better serve the clients.

413. Ms. Strunk-Zwick further stated Tri-Serve has "been blessed to have experienced tremendous growth over the last six months." She informed Tri-Serve clients nothing will change for them except contact information for Tri-Serve.

414. Sheakley vested resources and staff to steal all client information from Tri-Serve and to be ready to serve them as Tri-Serve did.

415. To insure all clients knew about the "move", Ms. Strunk-Zwick also mailed a hard copy to each Tri-Serve client.

416. Ms. Strunk-Zwick produced false financials for Ms. Grubbs on a monthly basis while Ms. Strunk-Zwick worked for Capital Concepts.  There was no growth. Capital Concepts funneled money to Tri-Serve to make sure payments were honored.

417. Ms. Strunk-Zwick changed the mailing address of Tri-Serve to Sheakley's address, for the Ohio Bureau of Workers Compensation, the IRS, State of Ohio ODJFS and the postal service. (Exhibit 136)

418. Hundreds of other changes were illegally entered by Ms. Strunk-Zwick to complete the theft of Tri-Serve from Ms. Grubbs. These had to be entered for every client and for each account.

419. The change Ms. Strunk-Zwick made with the Postal Service not only changed the mail for Tri-Serve, it also changed the mail for every business located at 9676 Dry Fork Road including

Capital Concepts. Ms. Strunk-Zwick and Sheakley Defendants changed the mailing address of the company they stole and the company they stole it from.

420. Ms. Strunk-Zwick emailed Ms. Fair requesting a bookshelf or credenza for her office on July 3, 2009. Ms. Fair responded on July 5, 2009 inquiring to Ms. Strunk-Zwick, "Are you under Matt's (M. Sheakley) or the PEO?" (Exhibit 137)

421. On July 5, 2009 at 11:19 p.m. Ms. Strunk-Zwick sent an email as her notice to terminate her position with Capital Concepts, Inc. and manager of Tri-Serve to Ms. Grubbs from her Tri-Serve email address. (Exhibit 138)

422. Ms. Strunk-Zwick intentionally sent this email late in the evening knowing Ms. Grubbs attended an out of town conference and did not have regular access to her email.

423. Ms. Strunk-Zwick not only continued to deceive Ms. Grubbs, she did so with the full knowledge and cooperation of the Sheakley Defendants and the Sheakley Defendants each financially benefited.

424. In one of the many false statements made by Ms. Strunk-Zwick she stated as the "President of the Company and I had no say." Ms. Strunk-Zwick was never the President of Capital Concepts or Tri-Serve.

425. She told lie after lie and a failed attempt to justify the theft of Tri-Serve from Ms. Grubbs of which there is no justification. (Exhibit 138)

426. Ms. Strunk-Zwick, trained in these tactics with her Transcon theft knew how to run a scam. The only difference from Transcon in this one is she had many co-conspirators.

427. Ms. Strunk-Zwick and the Defendants, led by Larry Sheakley conspired to and successfully stole Tri-Serve from Ms. Grubbs.

428. Had Defendant Banks properly protected Plaintiffs, Plaintiffs could have fired Ms. Strunk-Zwick and the theft of TriServe never taken place.

429. Ms. Strunk-Zwick was not only an employee of Capital Concepts; she became family to Ms. Grubbs.

430. Larry Sheakley, prior to this company theft, already achieved financial independence. Greed and hubris drove him for more.

431. In contrast to Sheakley, Capital Concepts was a small, but profitable family business. Capital Concepts had no debt and significant working capital before Ms. Strunk-Zwick began working for them.

432. Ms. Grubbs built a reputation based on a solid work ethic, outstanding performance and profitable results for Capital Concepts clients. She bought TriServe to do the same.

433. Ms. Strunk-Zwick built her reputation and image based on lies, deceit, adultery and theft.

434. Ms. Grubbs once dreamed of assisting others in founding their own companies as she approached retirement. She lost that dream with the theft of TriServe.

435. Capital Concepts was built from the ground up by Ms. Grubbs from her dining room table. Exhibit 1 of this complaint refers to Ms. Grubbs inspirational story of triumph and success, through personal heartbreak and tragedy which would have broken most people.

436. The Defendants actions took the Plaintiffs to the brink of financial ruin.

437. As of July 3, 2009, the date of Ms. Strunk-Zwick's "notice," Ms. Grubbs did not know it, but TriServe was gone. Even the staplers. Some marketing materials of TriServe "It's Done!" was all that was left.

438. Ms. Strunk-Zwick claimed in her notice she was taking Tri-Serve customers prior to the October 13, 2008 purchase date. However, she removed every customer file. She signed no customers. Ms. Strunk-Zwick had no rights to any property of Tri-Serve or Capital Concepts and her co-conspirators knew it. Ms. Grubbs purchased Tri-Serve in its entirety from Mr. Wegman.

439. Mr. Larry Sheakley and Sheakley Companies egregious behavior matched Ms. Strunk-Zwick's heinous actions.

440. Larry Sheakley and his legal counsel FBT knew Ms. Strunk-Zwick did not own Tri-Serve. A simple check on the Secretary of the State of Ohio's website reflected Ms. Strunk-Zwick was not listed on any company related to Tri-Serve. (Depositions and subpoenas will be fruitful.)

441. Larry Sheakley knew Mr. Wegman was the former owner of Tri-Serve and Ms. Grubbs bought it from him.  Larry Sheakley knew he had no right to that which he stole.

442. No Sheakley Defendant or a lawyer from FBT ever attempted to contact Ms. Grubbs.  Capital Concepts phone number is a signature line on many of the emails sent to Sheakley and clearly stated "Tri-Serve LTD, a subsidiary of Capital Concepts."

443. After Ms. Strunk-Zwick's "notice" to Ms. Grubbs, the fraud continued.

444. On July 6, 2009, Brett Horn entered Capital Concepts office.  He was not aware of the notice Ms. Strunk-Zwick sent to Ms. Grubbs.

445. Ms. Strunk-Zwick informed Mr. Horn and Mr. Ellison through email correspondence, that Ms Fernbach was on vacation and would not be in.  Ms. Strunk-Zwick had all messages forwarded to her cell phone. (Exhibit 139)

446. Mr. Horn became concerned because it was not standard practice to have everyone off.

447. Mr. Horn began calling Ms. Grubbs and walked into Tri-Serve's office space to discover everything was gone!  Everything except the aforementioned "It's Done!" materials.

448. Ms. Strunk-Zwick cleaned out every cabinet, removed every file, and left the office bare before Ms. Grubbs and her son, Brett Horn, knew what happened.

449. Ms. Strunk-Zwick deleted all computer files and emails.

450. Sheakley and Ms. Strunk-Zwick left Ms. Grubbs completely debilitated and still responsible for TriServe client debts; taxes, payroll, workers compensation, payroll and health insurance.

451. With assistance from Sheakley and the other Defendants in varying degrees, Ms. Strunk-Zwick stole the financial assets, proprietary information and confidential client information from the plaintiffs.

452. If Sheakley and Ms. Strunk-Zwick simply entered into an employment agreement and Ms. Strunk-Zwick left Tri-Serve, Ms. Grubbs could have simply hired a new manager to run Tri-Serve.

453. On July 6, 2009, Ms. Grubbs received Ms. Strunk-Zwick's email and received messages from Mr. Horn about the theft.  She replied to Ms. Strunk-Zwick's email.

454. Ms. Grubbs clearly stated "Do not write any checks on the accounts as you no longer have check signing privileges and do not contact the clients about any changes until I return." ACH is still active so that payroll can be made." "As far as Tri-Serve clients know it's business as usual."(Exhibit 140)

455. Exhibit 14 is Ms. Strunk-Zwick's response to Ms. Grubbs: "Do you not want me to pay the taxes or finish closing everything up?  Ms. Strunk-Zwick has no conscience.  She is wicked and evil.

456. Ms. Grubbs had no knowledge of Ms. Strunk-Zwick and the Defendant's actions until July 6, 2009.

457. Ms. Strunk-Zwick had access to funds in First Financial Bank.

458. Ms. Strunk-Zwick responded again to Ms Grubbs email about no signature privileges on July 6, 2009 and told Ms. Grubbs "That's fine if I do not have check signing privileges; however, I was planning on doing the taxes this week and need to write checks, do you not want me to do them? If so, who can sign them?" (Exhibit 141)  The gall to help your victim after you victimized them.

459. Ms. Grubbs responded to Ms. Strunk-Zwick's writing "Please prepare all checks for my signature I will sign them Monday." (Exhibit 142)

460. Ms. Strunk-Zwick deleted all of the files off the computers of Tri-Serve, yet she still had access to the records and files to do payroll and taxes.  These deletions were crimes which deserve prosecution.

461. Ms. Strunk-Zwick sent another email to Ms. Grubbs minutes after the last and stated "I'm planning on finishing the reconcile for Capital Concepts and financials and doing the payroll this week unless I hear otherwise from you." (Exhibit 143)

462. Ms. Grubbs responded to Ms. Strunk-Zwick saying "Thank you proceed as planned."  Ms. Grubbs still had no idea of the magnitude of the situation. (Exhibit 144)

463. In this next set of emails on July 6, 2009 between Ms. Strunk-Zwick and Ms. Grubbs, Ms. Strunk-Zwick is adamant she is not with Sheakley, and informs Ms. Grubbs: "I understand you are emailing my Sheakley email. Although it is set up I am not there until next week, so please continue to use my Tri-Serve or Capital Concepts email." More incredible behavior by Ms. Strunk-Zwick.

464. Ms. Strunk-Zwick's lies continued as she stated the following: "If you removed me from the accounts we will have a major problem as my signature prints on all paychecks and that will cause significant disruption if employees have their checks being returned and I have no way of uploading your signature today to print checks that need to go out today since you are out of town." (Exhibit 145)

465. Ms. Strunk-Zwick only worried about the checks she processed to embezzle more funds from Ms. Grubbs.

466. Ms. Grubbs responded on July 6, 2009 and informed Ms. Strunk-Zwick she simply replied to the email Ms. Strunk-Zwick sent her and the staff at Capital Concepts from her Sheakley email.

467. Ms. Strunk-Zwick's response:  "Very odd since I have no access to that email.....oh well they are forwarding them to me."

468. On July 6, 2009, Ms. Strunk-Zwick sent Ms. Fernbach the Tri-Serve HR Pyramid link with Tri-Serve's proprietary information. (Exhibit 146)

469. Sheakley stole Tri-Serve's HR Pyramid account. Sheakley proceeded to change all of the proprietary information on Tri-Serve's HR Pyramid to read Sheakley information and address. Since 2009, Sheakley has used all which they have stolen from Plaintiffs to further Sheakley business and profits.

470. When Sheakley would print out reports and payroll, it would indeed show Sheakley's information. However, those reports still printed using Tri-Serve's Hr Pyramid account number which is a TRI#, because Sheakley never acquired their own account, this was paid for by Tri-Serve. (Exhibit 147)

471. These pages for exhibit 147 are a few of thousands Sheakley printed out using Tri-Serve's account. Notice in the bottom right hand corner the TRIb-144, Tri-Serve's code and individual customer code. The top right reflects Sheakley's use of this well into the year 2010. Sheakley's information is on the upper left side.

472. HR Pyramid is extremely expensive software which Ms. Grubbs bought for the benefit of Tri-Serve. After this point Ms. Grubbs was locked out of her own software which was now being used by Sheakley for the maintenance of the clients they stole from Ms. Grubbs.

473. Ms. Strunk-Zwick forwarded to Ms. Fernbach payroll for center for Optimal Vitality which came through to Tri-Serve fax on July 3, 2009 and forwarded on July 6, 2009. (Exhibit 148)

474. Ms Strunk-Zwick's response to Ms. Grubbs requested her signature be uploaded for check purposes became nasty as she realized her access to funds has been eliminated. (Exhibit 149)

475. The statement Ms. Strunk-Zwick also made in this email is ironic: "I am not trying to make things difficult or cause problems." At this time Ms. Grubbs still had no idea the extent of the damage and loss Ms. Strunk-Zwick caused.

476. On July 6, 2009, Ms. Strunk-Zwick emailed Mr. Jason Leyda, Vice President Commercial Banking with First Financial, she told him she understood Ms. Grubbs had her removed from all Tri-Serve accounts.(Exhibit 150)

477. She continued to falsely inform Mr. Leyda that Ms. Grubbs is only the owner of TriServe #1, but she not the owner of TriServe LTD.  She continued to tell him it is Ms. Grubbs in fact who needs to be removed from the accounts associated with tax ID# 20-2280966. Ms. Strunk-Zwick stated they had a falling out and are parting ways.

478. Ms. Grubbs purchase of Tri-Serve included every subsidiary and all bank accounts. It is later discovered Ms. Strunk-Zwick used that Tri-Serve account to embezzle large amounts of funds from Ms. Grubbs.

479. Mr. Leyda responded to Ms. Strunk-Zwick he will call her tomorrow (Tuesday) morning and: "We will figure it all out."

480. Mr. Leyda responded and told Ms. Strunk-Zwick he will call her tomorrow (Tuesday) morning. "We will figure it all out," and she responded "thanks!"

481. The two women continue to email back and forth regarding the First Financial Bank accounts. Ms. Strunk-Zwick remained insistent that removing her name off the account will cause checks to be returned.  Ms. Grubbs responded to her in assurance the checks were good at the time Ms. Strunk-Zwick signed them. Only direct non electronic checks after July 3, 2009. (Exhibit 151)

482. On July 6, 2009, before the close of business Mr. Horn changed all the locks at the offices of Tri-Serve and Capital Concepts.

483. Ms. Grubbs told Ms. Strunk-Zwick: "How many ways can I say the same thing. It was and is not broken. I just double checked. The checks are good." "Payroll was never in jeopardy." "FYI you are still emailing me from astrunk@sheakleyhr.com." (Exhibit 151)

484. Ms. Strunk-Zwick told Ms. Grubbs she has been fielding calls all morning from employees and the bank; I don't think everything is okay. "In fact it's far from ok and your calling the bank created a significant issue."

485. Ms. Grubbs continued in this conversation to tell Ms. Strunk-Zwick she "just spoke with the downtown Hamilton client's service adviser Kristy Sandlin. Once again do not call anyone. It was fine until you called Jason in West Chester. Kristy is calling to assure him it has always been fine. For the last time the checks will be cashed. No employee should have any reason to call you as their check should have been cashed." (Exhibit 152)

486. Ms. Strunk-Zwick's response reflected the magnitude of her ability to manipulate a situation. She stated in a July 7, 2009 response to Ms. Grubbs, that I did not call Jason Leyda, he called me.

487. Mr. Ellison received a request from Ms. Strunk-Zwick on July 7, 2009 to find her information on a 529 plan for Tri-Serve. Ms. Strunk-Zwick still maintained she had not left and worked out of her house for Tri-Serve.

488. Ms. Strunk-Zwick continued to inform Ms. Grubbs "Your rash decisions have caused significant customer service issues that didn't need to be created." **"I'm not sure what you think I would do to harm you."** "I was willing to make this very amicable and an easy transition, but you have chosen to make it not only needlessly ugly, but detrimental to MY clients who I brought into your company." (Exhibit 153)  Wicked.  Evil.

489. Ms. Grubbs responded on July 7, 2009 to Ms. Strunk-Zwick's email stating: "I did not freeze the account Jason said he spoke to you and froze them as a result of talking to you. I have emailed and spoken to the correct person as well as Jason." "Jason became very confused when you told him you should not be removed from the accounts so not knowing who was right he said he froze the account." "Some how your login was frozen. I only know I did not freeze it."

490. An email approximately twenty minutes later from Ms. Grubbs to Ms. Strunk-Zwick addresses the following: "You had two employees pack up and go to work for someone else. You then

waited until I was gone and emailed me rather talk to me." All you had to do was talk to me and take a few weeks to wind down."

491. The email continued:  "No Notice just empty desks perhaps you should do some looking at yourself." "So now here we are. Let me know what I need to do to make sure payroll gets out. I need to pay bills and clear up contracts with Brian and well as you. The clients need to get their paychecks. I trust you will see to it they get them." "Tri Serv will stay in place until all matters between you and Brian are resolved with myself and Tri Serv is correctly sold or dissolved."

492. Ms. Strunk-Zwick's on July 8, 2009, stated she "worked at the office until midnight Monday and Tuesday and ran payroll in Susan's absence. ""I didn't just pick up and leave, nor did the employees."  A complete lie.  Shameless.

493. Ms. Strunk-Zwick did not work in the office of Capital Concepts after July 3, 2009. We know Ms. Strunk-Zwick was working for Sheakley and the locks had been changed at Capital Concepts.  Ms. Strunk-Zwick, Ms. Fernbach or Ms. Martin had given notice to Ms. Grubbs.

494. Ms. Strunk-Zwick, Ms. Fernbach and Ms. Martin each violated their confidentiality and non-compete agreements.

495. Despite their knowing Ms. Grubbs was the sole owner, Ms. Strunk-Zwick stole TriServe in a conspiracy with Sheakley.  They took all employees, all clients, all files and all records. They deliberately destroyed Ms. Grubbs opportunity for future income from Tri-Serve.

496. On July 7, 2009, Ms. Strunk forwarded to her email at Sheakley from her Tri-Serve email correspondence from Derek Carnohan from National Benefits Brokerage regarding Rev Media. The 24 pages included personalized Healthcare information for REV Media. (Exhibit 154)

497. Rev Media/FRA Ms. Grubbs paid the expense of signing Rev Media/FRA for Tri-Serve, but Sheakley stole them.

498. Not one new client of Tri-Serve can be attributed to Ms. Strunk-Zwick. Every client on the books of Tri-Serve was purchased by Ms. Grubbs, or brought in by Ms. Grubbs or Chad Middleton of Capital Concepts.

499. Ms. Strunk-Zwick sent an email to MasterTax giving them their new contact and bank account information. (Exhibit 155)

500. In response to Ms. Strunk-Zwick's email to Shelly Connaughton of The Nature's Way, (who states she did not receive the email Ms. Strunk-Zwick referred to) asked whether her payroll still went to the same place? (Exhibit 156)

501. Ms. Strunk-Zwick told Ms. Connaughton it should all go to the same place, but gave her her new email and Susan's and told her she will forward the "moving" email to her. She sent this from her Tri-Serve email address which still clearly stated: "Tri-Serve LTD, a subsidiary of Capital Concepts."

502. Mr. Colson of Next Step Networking responded to Ms. Strunk-Zwick's request on July 6, 2009 to take the Tri-Serve emails off the Exchange Server. (Exhibit 157)

503. Mr. Colson stated it should be no problem and asked if she had a new server which to attach the MX record. Ms. Strunk-Zwick explained the MX record is an address where his email addresses point to on the internet. He asked if they could talk in the afternoon.

504. Ms. Strunk-Zwick responded later in the day and stated she was sorry she missed him, if he could just set the following emails to forward for her she would have Rob Aycock call him later in the week to discuss the moving of the MX record, and provided him a list of emails she would like forwarded. All of these emails are Tri-Serve emails. (Exhibit 158)

505. MasterTax support agent Kareem McRoy responded on July 7, 2009 to Ms. Strunk-Zwick's request for the change of information. She asked if she understood correctly Tri-serve is now Sheakley Hr Solutions LLC, he also informed Ms. Strunk-Zwick the banking changes can be made in MasterTax under the Master Tab. (Exhibit 159)

506. Mr. Leyda emailed Ms. Strunk-Zwick stating he played phone tag with Ms. Grubbs today. The ACH is still frozen until he spoke with Linda. Ms Strunk-Zwick replied thanking him for his assistance. (Exhibit 160)

507. This level of correspondence between First Financial Bank and Ms. Strunk-Zwick should not have occurred. These were not her accounts.

508. On July 8, 2009, Mr. Leyda responded to Ms. Strunk-Zwick at her Sheakley HR email address and stated: "Angelia I have spoken with Linda who is copied on this email. I have unfrozen the ACH activity for Tri-Serve LTD to get files out. Linda and I will get together next week to discuss long term aspect of the accounts." (Exhibit 161)

509. First Financial did not offer any solution other than to allow Ms. Strunk-Zwick's signature on the account to be active, still giving Ms. Strunk-Zwick access to ACH ability.

510. Ms. Strunk-Zwick responded asking if all checks with her signature for both operating and payroll accounts for Tri-Serve LTD are still being honored.  Mr. Leyda responded to Ms. Grubbs giving information on the accounts and how they operate. He indicated both accounts are interdependent and must remain open.

511. During all the transference of information no one besides Ms. Strunk-Zwick used these accounts to embezzle money from Ms. Grubbs.

512. Ms. Strunk-Zwick notified the NAPEO of her new contact information on July 7, 2009. Ms. Catherine Schmutz, Director of Member Services responded on July 8, 2009 and asked Ms. Strunk-Zwick who should be their new contact at Tri-Serve and asked if she should contact Ms. Grubbs? Ms. Strunk-Zwick's reply, yes that's fine, Thanks. (Exhibit 162)

513. Membership in the NAPEO was for the benefit of Tri-Serve and Ms. Grubbs only joined after her purchase of Tri-Serve.

514. On July 9, 2009, Mr. Horn printed off some of Ms. Strunk-Zwick and Ms. Martin's Facebook and My Space pages. Ms. Strunk-Zwick plays the "oh, whoa is me card," claiming she had to begin her new job early and had to clean up an unnecessary mess with her old company. (Exhibit 163)

515. On July 10, 2009, Mr. Hank Wilson, Director of Contracts for MasterTax contacted Ms. Strunk-Zwick in regards to the email in exhibit 155. He asked if this was just a name change or an ownership change. Her response is "It is just a name change." (Exhibit 164)

516. On July 9, 2009 through July 10, 2009, there is a series of emails between Ms. Strunk-Zwick and Mr. Horn, with Ms. Grubbs being carbon copied.  On July 9, 2009, Ms. Strunk-Zwick emailed Mr. Horn stating: "I am going to try and have all of these checks done for you tomorrow to stamp." "I've had trouble getting onto the server...so hopefully tomorrow...I'm trying to do as many electronically as I can." (Exhibit 165)

517. Mr. Horn responded to Ms. Strunk-Zwick on July 10, 2009: "Your computer is turned off. We'll be here till 5:30 if you need to come down and print checks." "I also need your passwords for the company."

518. Ms. Strunk-Zwick proceeded to tell Mr. Horn she needed her computer left on so she could finish taxes. She told him her password is in the little black book in the top right hand drawer and provided him with others.

519. There was no drawer or book. There was nothing left.

520. Mr. Horn told Ms. Strunk her computer will be turned on in a minute. He asked her for her QB password for Capital Concepts and TriServe and other company login information. He stated he needed time to review any check she want signed.

521. She responded giving passwords and stated she would be working after 5:30.

522. Mr. Horn stated he had plans and will only be there till 5:30. If they needed mailed he will need them by 3 pm.

523. Ms. Strunk-Zwick responded "Yeah that's not going to happen :) It's not a fast easy process. But I will drop them off and you can handle however you want to."

524. Again on July 10, 2009, Mr. Horn responded and stated that is fine. I'll take them to the Post Office on Monday.

525. Later that evening Ms. Strunk-Zwick sent an email to Mr. Horn and Ms. Grubbs stating I stopped by the office to bring those tax payments and no one is there and the locks had been changed. Mr. Horn previously stated numerous times he would only be there until 5:30. While now at Sheakley, Ms. Strunk-Zwick through all this activity violated her signed agreements with Sheakley. They have not sued her and they not only allowed, but enjoyed Ms. Strunk-Zwick attempted to keep them from being sued by keeping Ms. Grubbs close.

526. Ms. Grubbs responded and asked if Ms. Strunk-Zwick spoke to him on the phone as his emails indicated he would only be in until 5:30. He asked Ms. Strunk-Zwick to give an exact time. She also offered she could meet Sunday afternoon or anytime next week.

527. Ms. Strunk-Zwick stated she was leaving to go out of town and wouldn't be back until Tuesday.

528. Ms. Strunk-Zwick requested on July 10, 2008 from Mr. Middleton of Capital Concepts a response to the tax notice for Eisen regarding a Tri-Serve tax issue. Ms. Strunk-Zwick had all

the files for Tri-Serve clients. Mr. Roeser of Eisen responded thanking everyone and requesting some salary changes as well. Ms. Strunk-Zwick responded claiming she will adjust for Eisen. (Exhibit 166)

529. Ms. Strunk-Zwick asked Ms. Grubbs on July 10, 2009 what she wanted to do regarding her car. She stated: "I can keep making the payments, I can set it up to automatically come out of my bank account, or you can have the car since it belongs to Tri-Serve. Just let me know so I can make the necessary arrangements." (Exhibit 167)

530. Ms. Strunk-Zwick emailed Ms. Horn regarding the 401K contributions for Oak Hills every two weeks on Tuesdays. She gave further instructions regarding performing this task. (Exhibit 168)

531. Ms. Strunk-Zwick responded to an email from EA Gregory with FMT solutions, on July 10, 2009 asking her if she will be teaching any RPT classes this fall. She responded to him stating her last day with Capital Concepts is today and referred him to Brett Horn. (Exhibit 169)

532. On July 13, 2009, Ms. Horn returned from her conference, where she obtained her requirements of her accreditation with financial planning. Upon her return she realized the scope of the tremendous damage Ms. Strunk-Zwick caused with Sheakley in regards to Tri-Serve and her personal embezzlement from Capital Concepts and Tri-Serve is discovered.

533. The time consuming task of investigation began on July 13, 2009. It took years to uncover everything and only through discovery during this case will everything be learned.

534. Mr. Brett Horn had back up tapes for Quickbooks. This meant Plaintiffs lost only the last week Ms. Strunk-Zwick was employed with Capital Concepts.

535. The deletion of files by Ms. Strunk-Zwick made it necessary for Capital Concepts to pay an expert to recover her deletions. Countless more hours of recovery work was necessary.

536. It was also during this week that Mr. Horn stopped the locked shred bin from going with Cintas and he recovered numerous documents Ms. Strunk-Zwick had placed in the bin for shredding. Legitimate business transactions usually do not require a cover up.

537. On July 13, 2009, Kirk and Company forwarded the message it received from Ms. Strunk-Zwick regarding the move to Mr. Wegman. On July 14, 2009 Ms. Erin Arnold of Next Step Networking forwarded the "move" email to Ms. Grubbs. (Exhibit 170)

538. Several clients expressed they were unhappy with the move, upset and received no notice and worried all of their information was converted to Sheakley.

539. Ms. Strunk-Zwick forwarded a fax intended for Tri-Serve to Mr. Middleton of Capital Concepts regarding the Studio 15 sales tax information. It gave a deadline of the end of the month for completion. (Exhibit 171)

540. Ms. Grubbs soon uncovered the embezzlement by Ms. Strunk-Zwick. Ms. Grubbs limited all communication with Ms. Strunk-Zwick. She felt additional stress over the betrayal by Ms. Strunk-Zwick.

541. Ms. Grubbs opened up her investigation with First Financial Bank and US Bank to uncover the status of the banking accounts for Capital Concepts and Tri-Serve.

542. Ms. Strunk-Zwick emailed Mr. Wegman and Ms. Grubbs on July 13, 2009 regarding the late payments for the 2008 401(k) contributions and the IRS Form 5500 from Abbie Bunge of Qualified Plan Consultants, LLC. (Exhibit 172)

543. On July 13, 2009, Ms. Strunk-Zwick emailed Mr. Leyda to determine if there had been a response regarding the July 8, 2009 email to Ms. Grubbs about the accounts with First Financial. She sent another email on July 14, 2009 stating since she can't get a response I am going to continue to assume it's ok and I will continue to process the tax payments accordingly. (Exhibit 173)

544. Ms. Grubbs obtained legal counsel on July 13, 2009. It was necessary for her to ask functional questions going forward such as should she file the other incorporation paperwork they discovered Ms. Strunk-Zwick did not file.

545. Ms. Grubbs also reached out to the former owner Mr. Wegman and his wife Bridgete for their assistance. Bridgete is an accountant and Mr. Wegman, as the former owner of Tri-Serve had the PEO insight they needed to help understand the complicated maze which Ms. Strunk-Zwick left.

546. They discovered Ms. Strunk-Zwick produced false financials for both Capital Concepts and Tri-Serve.

547. An email from Ms. Strunk-Zwick to Ms. Grubbs and Mr. Middleton on July 14, 2009 states "Since you have removed my access to everything I cannot complete the financials or taxes."

"I'm dropping off what I did do in the drop box now at the office." further stating "I was trying to be helpful." (Exhibit 174)

548. Ms. Erin Arnold of Next Step Marketing responded on July 14, 2009 to Ms. Grubbs request for assistance of July 13, 2009. Ms. Grubbs made a request to have a technician sent out tomorrow on July 14, 2009 to recover Ms. Strunk-Zwick's deleted files and see about passwords on the server. She also requested Ms. Arnold's email from Ms. Strunk-Zwick regarding the move to Sheakley.

549. Ms. Arnold scheduled a technician for the afternoon of July 14, 2009.  Ms. Strunk-Zwick was at their office on July 10, 2009 regarding insurance and did not say anything about the move. Also, Ms. Arnold asked Ms. Grubbs if she should reach out to Ms. Strunk-Zwick about Ms. Arnold's payroll due on July 20, 2009. (Exhibit 175)

550. Ms. Strunk-Zwick sent another email to Ms. Gubbs and Mr. Horn regarding Mr. Douglas Martin's 401K contribution. Ms. Strunk-Zwick stated she is still talking to Maria with John Hancock and it hasn't been resolved. (Exhibit 176)

551. On July 16, 2009 Ms. Strunk-Zwick asked Mr. Middleton if he wished to have assistance doing payroll. She had not heard back from him. He told her he had been swamped. He had been dealing with Star Motors. She responded saying "Ok, I just want to make sure the items that were time sensitive got done, like the 941's on the 15th." (Exhibit 177)

552. Ms. Strunk-Zwick again stated to Mr. Middleton she didn't hear back from him and assumed he completed the 941's.

553. Ms. Strunk-Zwick received an email from Robin Madden at MOM regarding meter readings for the equipment fraudulently obtained by Ms. Strunk-Zwick. She changed the contact information to Mr. Horn. (Exhibit 178)

554. Ms. Strunk-Zwick again stated to Mr. Middleton she did not hear from him and assumed everything is under control. (Exhibit 179)

555. On July 15, 2009, Ms. Strunk-Zwick opened new accounts with First Financial.

556. Ms. Grubbs on July 17, 2009 emailed Ms. Strunk-Zwick regarding the fact there were outstanding checks and Ms. Strunk-Zwick left no money in the account at First Financial to pay the liabilities for Tri-Serve.  (Exhibit 180)

557. Ms. Grubbs directly asked Ms. Strunk-Zwick how these bills were going to be paid without additional deposits from the clients?" And stated "CHAD DOES INDEED NEED YOUR HELP TO MAKE ENOUGH MONEY APPEAR IN THE BANK TO COVER THESE TAXES." (Exhibit 179)

558. Ms. Strunk-Zwick responded on July 18, 2009 stating "Again, I did the math and there was plenty of money to cover the taxes and payables that were due." She continued: "Although most of QB (QuickBooks) was updated I had not finished the journal entries for June, and I find it hard to believe you know how to obtain that information."

559. Ms. Strunk-Zwick falsified financials and journal entries so even if they had been completed they still would not have been accurate.

560. On July 16, 2009, Ms. Grubbs sent a notarized letter to Wells Fargo and stated Ms. Strunk-Zwick had no authorization to enter into any contract. Ms. Strunk-Zwick accepted a check from MOM on behalf of Tri-Serve, stating she was the President of the Company. She also signed a $24,000.00 lease agreement on a new copier through MOM, financed by Wells Fargo, where she signed as President of Capital Concepts. (Exhibit 181)

561. On July 20 2009, Ms. Strunk-Zwick requested from Ms. Martin the spreadsheet she had put together with the clients new workers compensation rates as of July 1, 2009. She claimed it was the cost comparison they gave to prospects. Ms. Martin forwarded the client information on July 21, 2009. (Exhibit 182)

562. Ms. Strunk-Zwick responded on July 23, 2009 to Ms. Grubbs email of July 16, 2009, in which Ms. Grubbs informed Ms. Strunk-Zwick she was due for June and July payments.

563. Ms Strunk-Zwick responded and informed Ms. Grubbs she is going to make her July payment directly to the bank since she paid Capital Concepts her May and June and they were apparently not forwarded. This conversation stems from Ms. Strunk-Zwick's original email Exhibit 167. (Exhibit 183)

564. Ms. Martin emailed to Ms. Fernbach and Ms. Strunk-Zwick on July 24, 2009 the most updated Tri-Serve client information sheet. (Exhibit 184)

565. Ms. Strunk-Zwick forwarded from her personal email to her Sheakley email address a copy of the original Tri-Serve formation documents, Exhibit 31 on July 24, 2009, this email was 61 pages in length. (Exhibit 185)

60

566.Ms. Strunk-Zwick forwarded from her personal email to her Sheakley email Tri-Serve customer information documentation on Norwood Family Dental aka the The Wallace Group Dentistry for Today, Inc. on July 25, 2009. (Exhibit 186)

567.On July 27, 2009, Ms. Strunk-Zwick emailed Mr. Middleton stating Ms. Grubbs informed Ms. Strunk-Zwick she was not going to pay workers compensation for the clients. Mr. Middleton forwarded the message to Ms. Horn and stated he believed Capital Concepts paid them. (Exhibit 187)

568.Ms. Grubbs removed money from her personal retirement account to pay the bills for Tri-Serve, a business which Defendants collectively stole.

569.On July 28, 2009, Ms. Strunk-Zwick emailed Ms. Fernbach that she needed to set up the new Ignite Philanthropy client again. (Exhibit 188)

570.On July 28, 2009, Ms. Strunk-Zwick, still accessed Capital Concepts emails, forwarded a Domain Discover Password Recovery link to Ms. Grubbs. (Exhibit 189)  This access was and is criminal.

571.In July 2009, US Bank began its investigation into Ms. Strunk-Zwick's action.

572.On July 29, 2009 Mr. Tom Pappas Jr. met with Ms. Grubbs, Mr. Horn and Mr. Wegman to discuss Ms. Grubbs accusations against Sheakley.

573.On July 30, 2009 Mr. Tom Pappas emailed Ms. Grubbs regarding a workers compensation notice for a Tri-Serve client. She believed after the meeting on July 29, 2009 it was best to send this correspondence to him first.  (Exhibit 190)

574.Mr. Pappas responded stating he had forwarded it to the appropriate people in their Group. He has continued to ask if Ms. Grubbs had an opportunity to speak with her attorney.

575.During July 2009, Mr. Horn intercepted a Cintas employee who picked up items from the shred bin in hopes Mr. Horn could find information.

576.Mr. Horn did not find information regarding the stolen Tri-Serve client files from the shred bin, but he did find personal information Ms. Strunk-Zwick placed in the bin to be shredded. (Exhibit 191)

577. Mr. Horn discovered two credit cards and after a phone call placed to the individuals on the cards learned Ms. Strunk-Zwick had applied for and received these cards without the direct knowledge or consent of their intended recipients.  She committed yet another crime.

578. Prior to Ms. Strunk-Zwick leaving Capital Concepts, she filed Chapter 7 Bankruptcy on June 30, 2009. (Exhibit 192)

579. Ms. Strunk-Zwick listed her employer and sole source of income as Capital Concepts on her bankruptcy documentation.  She knew, not only was she going to work for Sheakley, she had already begun working for Sheakley.

580. On August 4, 2009, Mr. Pappas and Ms. Grubbs exchanged emails which included correspondence between Mr. Leyda of FFB, regarding scheduled ACH's which were still trying to come out of a Tri-Serve account. (Exhibit 193)

581. An August payment of insurance for some company Ms. Grubbs could not identify with Tri-Serve and the Kentucky Department of Revenue came out of the Tri-Serve account.

582. Due to the theft by Ms. Strunk-Zwick, these accounts overdrew and the Kentucky Department of Revenue check was returned.

583. Mr. Leyda from FFB informed Ms. Grubbs he placed an ACH block on all accounts, but the two aforementioned ACHS were still processed.

584. On August 6, 2009, Ms. Strunk-Zwick attended her 341 Bankruptcy Hearing.  It was recorded and attached.  Ms. Strunk-Zwick stated she is still employed by Capital Concepts and this is her sole source of income. (Exhibit 194)  She committed yet another crime.

585. Ms. Strunk-Zwick concealed the identity of her current employer Sheakley. Her current salary and commission structure, auto and cell phone allowance with Sheakley proved significantly higher than her salary with Capital Concepts.

586. On August 7, 2009, Ms. Grubbs e-mailed Ms. Susan Wurzelbacher, a Senior Investigator and Bank Officer with US Bank's Corporate Security Division. (Exhibit 195)

587. Ms. Grubbs asked Ms. Wurzelbacher about the vehicle loan Ms. Strunk-Zwick fraudulently obtained from US Bank. Ms. Grubbs stated Ms. Strunk-Zwick still drove the vehicle and it is

still in Capital Concepts name.

588. Ms. Grubbs became concerned that the vehicle was not insured according the Capital Concepts corporate insurance policy and Capital Concepts would be responsible for the vehicle if an accident occurred.

589. On August 12, 2009, Ms. Wurzelbacher informed Ms. Grubbs that Carissa with US Bank would be back in the office on August 13, 2009. Carissa is who Ms. Grubbs previously dealt with on the issue.

590. On August 11, 2009, Ms. Strunk-Zwick sent an email to Brian Wegman and Linda Horn regarding a workers compensation issue for Mr. Bob Kitko. (Exhibit 196)

591. Ms. Strunk-Zwick stated Mr. Wegman had an obligation to pay this with the state despite there being no funds to pay any obligations on behalf of any clients.

592. Mr. and Ms. Grubbs had to use all of Ms. Grubbs retirement account, nearly one million dollars, to pay on behalf of Tri-Serve clients.

593. Sheakley received the payments from these same clients. Therefore, Ms. Grubbs never received the revenue from clients Ms. Grubbs could have used to pay any delinquencies left her by Ms. Strunk-Zwick's failure to pay obligations was eliminated.

594. On August 11, 2009, Ms. Strunk-Zwick emailed Ms. Grubbs a nasty note regarding US Bank firing Mr. Allen over his relationship with Ms. Strunk-Zwick. In this correspondence Ms. Strunk-Zwick threatened Ms. Grubbs. (Exhibit 197)

595. Ms. Strunk-Zwick stated to Ms. Grubbs, "I hope you are ready for what you have started. I doubt that FINRA would be happy to learn how you have forged clients names."

596. Ms. Strunk-Zwick's threat was untrue and if it were true it could have cost Ms. Grubbs her accreditations, certifications and licenses.

597. Ms. Strunk-Zwick attempted to intimidate Ms. Grubbs in retaliation of the revelation of her deceit and US Bank fired her lover, Mr. Allen.

598. Mr. Allen was fired from his job because of his involvement with Ms. Strunk-Zwick, her connections with accounts housed at US Bank and the documentation presented via Mr. Allen to US Bank.

599. Ms. Grubbs responded on August 12, 2009 via email to her attorney to an accusation by Mr. Neil DeSai on behalf of Grant Cowan and Sheakley regarding Ms. Strunk-Zwick's auto loan. (Exhibit 198)

600. In this email, Ms. Grubbs laid out the events during the period in April 2009 when Ms. Strunk-Zwick tampered with and created fraudulent emails for the dates of April 7 - April 8, 2009.

601. Not only were these emails presented to Sheakley, who came to Ms. Strunk-Zwick's defense, they were also presented to US Bank regarding the forged loan on the vehicle Ms. Strunk-Zwick drove.

602. The tampering and falsification of these emails caused the plaintiffs needless legal expense and valuable time.

603. The emails Ms. Grubbs presented as evidence in response of this accusation were verified through Ms. Grubbs network server and Ms. Grubbs actions were verified by their tax preparation software.

604. Ms. Strunk-Zwick changed these emails to falsely present Ms. Grubbs was aware of her actions with regards to the auto loan account number 5500026017000, with US Bank.

605. Ms. Strunk-Zwick would further falsify a statement that Ms. Grubbs gave Ms. Strunk-Zwick permission to sign her name on the documents if she was not available.

606. Ms. Strunk-Zwick lied and told the US Bank during the investigation it was because Ms. Grubbs was in Maui on vacation.  This was untrue.

607. On April 11, 2009, to further the crimes and conspiracies, Ms. Strunk-Zwick forwarded a series of emails to herself.

608. She further falsified another email, giving her check number which she stated was paid to Capital Concepts for her car payment and phone.

609. Even after the evidence of Ms. Strunk-Zwick's fraudulent emails were proven to Sheakley, Sheakley chose to stand by and continue to defend Ms. Strunk-Zwick, instead of terminating her.

610. If Sheakley were truly innocent in the theft of Tri-Serve, they would have severed all ties with Ms. Strunk-Zwick upon leaving of Ms. Strunk-Zwick's crimes.

611. Sheakley chose to continue to defend Ms. Strunk-Zwick because of their joint complicit involvement in the theft of Tri-Serve from Ms. Grubbs.  Sheakley feared reprisal from Ms. Strunk-Zwick.

612. During the course of the criminal case against Ms. Strunk-Zwick, she lied and stated that due to Ms. Grubbs Charcot-Marie-Tooth Disease (CMT), she allowed Ms. Strunk-Zwick to sign documents for her.

613. The only permission Ms. Grubbs gave for Ms. Strunk-Zwick to sign her name was on was Tri-Serve and Capital Concepts webpage and for use as her email signature.

614. Ms. Grubbs wanted a cleaner signature for the webpages and her email signature.  It was for marketing purposes, nothing more. The signature looks nothing like Ms. Grubbs actual signature on the forged instruments. (Exhibit 199)

615. The signature Ms. Strunk-Zwick forged on documents was obviously an attempt to duplicate Ms. Grubbs actual signature and not the signature provided by Ms. Strunk-Zwick for Capital Concepts web page.

616. As is documented, Ms. Strunk-Zwick deliberately forged Ms. Grubbs signature on all documents. Ms. Grubbs had always signed everything and assumed she still did. Even the most minor document was signed by Ms. Grubbs.  Ms. Grubbs did not realize Ms. Strunk-Zwick intercepted and blocked documents from her.

617. On August 12, 2009, Mr. Barry Rubenstein of Star Motors sent Ms. Strunk-Zwick a letter, copied it to Ms. Grubbs. (Exhibit 200)

618. He expressed his dissatisfaction with Capital Concepts performance.  He told Ms. Strunk-Zwick "I know you left Capital Concepts and have taken my payroll work with you" "None of this makes sense to me."

619. Ms. Grubbs forwarded the e-mail to Mr. Middleton and asked him, "Can you explain this? Call him and get this resolved before she (referring to Ms. Strunk-Zwick) holds this against us, although probably too late." (Exhibit 201)

620. In an August 12, 2009 reply to the forwarded letter to Mr. Rubenstein, Mr. Middleton of Capital Concepts responded to Ms. Grubbs about the letter of dissatisfaction from Star Motors and Mr. Rubenstein.

621. Mr. Middleton stated as of tomorrow Mr. Rubenstein will no longer be our client.

622. Mr. Rubenstein didn't want to pay to have his books done; he gave all information to Ms. Strunk-Zwick.  He stated all was lost and it was on her computer.

623. On August 13, 2009, Ms. Grubbs e-mailed Ms. Strunk-Zwick and specifically asked for the return of the Toyota Solara titled in the name of Capital Concepts. (Exhibit 202)

624. Ms. Grubbs further requested Ms. Strunk-Zwick return it to the office on Dry Fork Road no later than 8 pm on August 14, 2009 and asked all keys be dropped in the drop box at the front door.

625. Ms. Strunk-Zwick replied that the car is insured and has Capital Concepts listed as an additional insurer but would be happy to drop the car off as directed.

626. At this time, Ms. Grubbs did not know the vehicle was titled in the name of Tri-Serve and the loan is in Capital Concepts name.

627. On August 19, 2009, Ms. Strunk-Zwick emailed Mr. Ted Kuttrus stating she did not receive a check in the mail again and asked him to please put it in the mail so she could deposit it on Friday. (Exhibit 203)

628. In e-mails between August 19 and 20, 2009, Ms. Strunk-Zwick received an e-mail from Mr. Sheehan from Sheehan Pools regarding the Department of Kentucky Revenue. (Exhibit 204)

629. Ms. Strunk-Zwick e-mailed Ms. Grubbs and had the gall to reprimand her for a check bouncing for a Tri-Serve client.

630. Ms. Strunk-Zwick left no sufficient funds in the account and it was Ms. Strunk-Zwick who originated the payments. Ms. Strunk-Zwick further demanded a response regarding the matter.

631. On August 24, 2009, Ms. Grubbs reached out to Mr. Pappas.  He forwarded it to Ms. Strunk-Zwick, stating "We need to address the issues raised in Linda's email right away." (Exhibit 205)

632. Ms. Grubbs explained to Mr. Pappas "they were informed by the IRS Tri-Serve's second quarter 2009 941 return has yet to be filed."

633. Ms. Grubbs continued to inform Mr. Pappas Capital Concepts is not in possession of these documents as they were moved to Sheakley. Ms. Grubbs requested copies of all tax documents.

634. Ms. Strunk-Zwick responded stating no addresses were changed to Sheakley by her and to her knowledge they have not received any tax information via mail.  Lies, lies, lies.

635. Ms. Strunk-Zwick claimed she left all files in the cabinets at Tri-Serve.  Another lie.

636. Not only did Ms. Stunk-Zwick state in her notice (Ex. 138) she took all files prior to Ms. Grubbs purchase of Tri-Serve in 2008.  She acknowledged she took the tax records for 2009 in this email.

637. Ms. Strunk-Zwick never returned anything to Capital Concepts for the benefit of Tri-Serve.

638. Mr. Pappas forwarded Ms. Strunk-Zwick's email to Ms. Grubbs on August 25, 2009 and told her that based on Ms. Strunk-Zwick's response it appears Ms. Grubbs has all the information and files to complete these items.

639. Mr. Pappas also stated Ms. Strunk-Zwick explained no changes were made to MasterTax and told Ms. Grubbs she needed to address the delinquency immediately.

640. This provided further evidence that Sheakley continued to support Ms. Strunk-Zwick's theft while they conspired with her to execute the theft.

641. On August 24, 2009, Mr. Don McGoran of McGoran Insurance confirmed Ms. Grubbs conversation with him on Tuesday, August 18, 2009 wherein they agreed to bind coverage on

the 2006 Toyota which Ms. Grubbs inadvertently acquired. (Exhibit 206)

642. He confirmed with Ms. Grubbs that since the vehicle was placed in storage, there will only be comprehensive coverage on the vehicle and US Bank will be listed as the loss payee.

643. Mr. McGoran requested Ms. Grubbs inform him when the bank repossesses the vehicle or it is otherwise disposed of.

644. On August 26, 2009, Ms. Grubbs e-mailed Ms. Wurzelbacher and Ms. Carissa Blea of US Bank's Corporate Security Division. (Exhibit 207)

645. Ms. Grubbs forwarded to them the e-mail in reference to insurance coverage from Mr. McGoran and informed Ms. Wurzelbacher and Ms. Blea that the car is parked in storage and awaits US Bank's retrieval of the car.

646. She further stated she will no longer be making payments on the car since the car loan was not signed for by Ms. Grubbs. She also asked when she could expect them to come pick up the car.

647. Ms. Wurzelbacher responded stating that she appreciates the continued communication and she has spoken with Ms. Anderson from another division of US Bank regarding the lease. She states she will forward it to her because this is her area of expertise.

648. Ms. Wurzelbacher stated she knew Ms. Blea has been helping with statements, copies and records regarding Ms. Grubbs account and that she will continue with this assistance. Ms. Wurzelbacher added she will be available for anything else they may need.

649. On August 26 through 27, 2009 Ms. Grubbs and Ms. Wurzelbacher continued their conversation, but it now focused on the remaining forgeries regarding Ms. Strunk-Zwick. (Exhibit 208)

650. Ms. Grubbs asked Ms. Wurzelbacher about the responsibility of US Bank for the SinglePoint ACH forgery.

651. Ms. Grubbs explained that Mr. Allen filled out the application and Ms. Strunk-Zwick forged Ms. Grubbs signature and embezzlement of monies occurred because of the access to this SinglePoint ACH account.

652. Ms. Wurzelbacher responded stating the last time they spoke Ms. Grubbs focus was on reconciling the Tri-Serve First Financial accounts.

653. She continued to state she knew Ms. Grubbs requested copies of statements and transactions from US Bank but was not aware Ms. Grubbs had acquired proof that Ms. Strunk-Zwick had redirected funds into Ms. Strunk-Zwick's personal account.

654. Ms. Wurzelbacher is aware of the forged documents regarding the lease documents and Ms. Anderson is trying to correct the situation regarding the forged lease documents at this time.

655. Ms. Wurzelbacher writes: "By all means we will do everything we can regarding this situation."

656. Ms. Wurzelbacher continued to say that she will help in any way that she can in regards to moving forward, and that she realized Ms. Grubbs thought that the SinglePoint product was something everyone had access to as part of the checking account package.

657. Ms. Wurzelbacher understood that Ms. Grubbs was not aware that only Ms. Strunk-Zwick had access or that Ms. Strunk-Zwick forged Ms. Grubbs signature to gain access.

658. Ms. Wurzelbacher further stated she will make the legal department aware of the situation and she would like to meet with Ms. Grubbs, Mr. Horn and Carissa regarding the next steps once she obtained all items identified in which Ms. Strunk-Zwick misdirected funds for her own personal gain.  The outside legal counsel for US Bank is FBT.

659. On August 26 through August 28, 2009 emails transfer between Ms. Grubbs, Mr. Pappas and Ms. Strunk-Zwick. Ms. Grubbs reaches out to Mr. Pappas desperate for assistance in having the files for Tri-Serve returned. She sent him an attachment from the IRS showing Ms. Strunk-Zwick changed the address. (Exhibit 209)

660. Ms Grubbs continued to dispute Ms. Strunk-Zwick's lies to Pappas.

661. Ms. Grubbs informed Mr. Pappas that Ms. Grubbs paid the Sheehan Pools payment to the Kentucky Department of Revenue and informed him he had to place funds in the Tri-Serve account to cover all checks written.

662. Ms. Grubbs told Mr. Pappas she is beginning to receive many third quarter invoices for

workers compensation and health insurance.

663. She stated she is not certain what to do with them as Sheakley received the client payments, yet Tri-Serve covered payroll in July and received no payments.

664. Mr. Pappas replied with a defense for Ms. Strunk-Zwick, stating she said she dropped off the files. He wanted Ms. Grubbs to send him a copy of the check sent to the Kentucky Department of Revenue, because he says it still shows delinquency.

665. On August 30 to August 31, 2009, Ms. Grubbs sent another email to Mr. Pappas and Ms. Strunk-Zwick requesting the records she previously requested from them for the IRS. Ms. Strunk-Zwick had not dropped off any records. (Exhibit 210)

666. Ms. Strunk-Zwick's response to this is her insistence she dropped off records. A lie.

667. Mr. Pappas restated they do not have any files per Ms. Strunk-Zwick's response and he wanted a copy of the check sent to the Kentucky Department of Revenue.

668. Mr. Wegman stated that after Tri-Serve was stolen by Sheakley, Ms. Martin called him and asked him what was going on, and if they were in trouble for moving files. An admission by Ms. Martin.

669. Mr. Wegman explained to Ms. Martin what had actually happened with Tri-Serve being stolen.

670. Mr. Wegman continued to state that when Ms. Strunk-Zwick would deny they had the files to her supervisors and Ms. Grubbs, he would ask Ms. Martin if the information was there. She would tell him if was at Sheakley. Mr. Pappas knew the files were at Sheakley.

671. On September 1, 2009, Mr. Rubenstein emailed Ms. Strunk-Zwick regarding a delinquent tax amount owed by him to the State of Ohio. (Exhibit 211)

672. On September 1, 2009, Ms. Denise Anderson who is a Fraud Specialist with US Bank, made her first contact with Ms. Grubbs. (Exhibit 212)

673. Ms. Anderson forwarded copies of the equipment finance contract on the vehicle and asked for Ms. Grubbs to review the document.

674. Ms. Anderson stated if Ms. Grubbs does not feel this is her signature, Ms. Anderson asked her to provide proof.

675. Ms. Anderson also asked Ms. Grubbs at this time how Ms. Strunk-Zwick was able to obtain a copy of her driver's license.

676. On September 2, 2009, Mr. Wegman and Ms. Grubbs sent verification of Ms. Grubbs ownership of Tri-Serve, and request she have access to the software and that Ms. Strunk-Zwick's access to the account be blocked. (Exhibit 213)

677. On August 28, 2009, they also FedExed a check to MasterTax for the amount due and payable.

678. This payment simply gave them some access to their own records regarding taxes, this did not give them access to the entire client file which was stolen and converted to Sheakley's property.

679. On September 4, 2009, Ms. Grubbs' legal counsel emailed to Ms. Grubbs a copy of his proposal for a settlement with Sheakley. (Exhibit 214)

680. This proposal delineated certain expenses Ms. Grubbs underwent in the beginning of the theft of Tri-Serve, certain start up fees and a small projected loss of income. It did not include any of the expenses she incurred as a result of the theft or embezzlement.

681. It also did not include any of the clients later discovered to have been placed directly on Sheakley's books or acquired for Sheakley's direct benefit.

682. This information was not available to Ms. Grubbs' legal counsel at the time. Ms. Grubbs wanted to be released of liability for Tri-Serve since she no longer "owned" it by virtue of theft.

683. The settlement grossly underestimated the value of Tri-Serve and future earning potential, as well as expenses. It was never agreed to or signed by any party.

684. Due to the theft of Tri-Serve, Ms. Grubbs was paying for expenses for a company which was stolen in it's entirety by Sheakley and Ms. Strunk-Zwick. She's still paying.

685. Ms. Grubbs wanted a law enforcement investigation of Sheakley. One has never happened.

686. Compensatory damages to Plaintiffs exceed a hundred million. Punitive damages are one billion based upon the compensatory damages.

687. Sheakley left Ms. Grubbs in a state of liability to the clients of Tri-Serve due to the delinquent actions of Ms. Strunk-Zwick not to pay the liabilities of the clients of Tri-Serve and embezzlement of funds and the conversion by Sheakley of Tri-Serve clients.

688. On September 11, 2009, Ms. Grubbs asked Ms. Anderson for her advice regarding the vehicle since she is still storing the vehicle. Ms. Grubbs asked if she should just have the police impound it since she never purchased it. (Exhibit 215)

689. Ms. Anderson replied that they were having a meeting the following week and would call Ms. Grubbs.

690. On September 14, 2009, Ms. Wurzelbacher of US Bank responded to Ms. Grubbs's September 11, 2009 request for information. (Exhibit 216)

691. Ms Grubbs requested a referral to any agent that Ms. Wurzelbacher had worked with from the Secret Service.

692. Ms. Wurzelbacher gave Ms. Horn the phone number and stated she is usually referred to any agent that is available at the time and they are all equally thorough.

693. On September 14, 2009, after hearing back regarding the denial of responsibility by Sheakley, Ms. Grubbs filed a complaint with the Internet Complaint Center (IC3). Complaint number I0909141456361662. (Exhibit 217)

694. This complaint eventually was forwarded to the FBI and US Secret Service for investigation.

695. On September 15, 2009, a letter from Sheakley who sent to Mr. Wegman and Dynamic Plastics, Inc. at Capital Concepts address on Dry Fork Road. (Exhibit 218)

696. This letter from Sheakley UniService Inc. stated that the company is in the process of updating their database to reflect correct company information.

697. It should be noted that all information regarding contact has Mr. Wegman listed and had his Tri-Serve phone number and his old Tri-Serve address. This indicated the information Sheakley had regarding TriServe came from the original Tri-Serve files.

698. On September 16, 2009, Sheakley UniService, Inc. sent letters through their Client Retention Specialist requesting funds from "accounts payable" divisions of clients who were in a PEO relationship with Tri-Serve. (Exhibit 219)

699. These clients were illegally transferred to Sheakley using Tri-Serve's proprietary information and software for services that Tri-Serve provided to these clients.

700. Due to the transference of clients through Tri-Serve's proprietary software, and the PEO relationship with Tri-Serve, clients addresses were listed as 9676 Dry Fork Road Harrison, OH 45030 which was left in Sheakley's system for these Tri-Serve clients.

701. In this letter, Sheakley tried to collect past due balances from these clients for Worker's Compensation Cost Control Services.

702. On September 22, 2009, Ms. Horn e-mailed Ms. Anderson regarding the vehicle stating she still heard nothing from her, and gave her phone number. (Exhibit 220)

703. Ms. Grubbs also stated that she had filed a complaint with the Hamilton County Sheriff's office and had a meeting with the Secret Service on September 30, 2009.

704. Ms. Anderson's replied their attorney is reviewing this and we hoped to hear from him by tomorrow (September 23, 2009). Their attorney of course is FBT.

705. On September 23, 2009, Ms. Anderson e-mailed Ms. Grubbs stating Ms. Strunk-Zwick forwarded e-mails in which you have discussed the car. (Exhibit 221)

706. According to these e-mails, you were aware the vehicle was in the company's name but was used for personal purposes and because the equipment was taken out for something other than business use and it is in default of your contract and will need to be paid off.

707. These e-mails seemed to indicate Ms. Grubbs knew about the loan based on the "fraudulent e-mails" sent to Ms. Anderson by Ms. Strunk-Zwick.

708. These e-mails were also presented to Sheakley and their attorneys regarding the vehicle and Ms. Grubbs has already defended this accusation once.

709. Ms. Anderson gave Ms. Grubbs a pay-off amount of $17,822.10 and stated the pay-off will need to be received by September 30, 2009.

710. On September 23, 2009 Ms. Grubbs responded to Ms. Anderson's accusation she knew about the loan. (Exhibit 222)

711. She asked Ms. Anderson to please send out her fraud investigation officer Ms. Wurzelbacher as soon as she can so she can see the e-mail in electronic form on the server that show differences in the e-mails at the exact time they were sent.

712. Ms. Grubbs also stated she is fully aware of these false e-mails as Ms. Strunk-Zwick also gave these to her current employer.

713. She stated that the only way to see that e-mail is not altered is to see it in the original form in the sent folder.

714. Ms. Strunk-Zwick repeatedly told people the Maui lie.

715. Ms. Grubbs continued to state that she has been preparing taxes for thirty years and has been at her desk all day, everyday from February first through April fifteenth every year.

716. She had client meetings logged into their tax preparation equipment as proof. Ms. Grubbs continued to state she is disappointed with how the situation is being handled by US Bank.

717. Ms. Grubbs further showed her disappointment with US Bank's position by stating, Ms. Strunk-Zwick was denied the ability to be a customer of your bank and I have provided proof of her criminal background and you are choosing to base this on unverified e-mails.

718. Ms. Grubbs informed Ms. Anderson she did not know about the forged SinglePoint document that Ms. Strunk-Zwick transferred money via that account into her personal account for her use and used her credit card for personal use.

719. Ms. Grubbs made it clear that she will not pay for a loan taken out by a criminal and will

continue to have contact with the District Attorney and the Secret Service and after she proves these accusations to be false and no positive action is taken by US Bank, she will take action against US Bank.

720. In her September 23, 2009 response to Ms. Grubbs, Ms. Anderson requested her to send proof the e-mails are false. (Exhibit 223)

721. On September 23, 2009, Ms. Arnold of Next Step Networking, who is Capital Concepts and Tri-Serve's IT provider, emailed Ms. Grubbs the e-mails in question directly from the server. (Exhibit 224)

722. Ms. Grubbs responded on September 23, 2009 and she sent the e-mails in question to Ms. Anderson and also shows her how easy it is to change an e-mail in electronic form. She asked her to compare sent times. (Exhibit 225)

723. Ms. Anderson stated that they will be reviewing the e-mails. She also asked if Ms. Grubbs could send her the name of the District Attorney and the Secret Service agent.

724. On September 23, 2009, an appointment was scheduled for September 24, 2009 between Ms. Grubbs and attorneys Frank Robbins and James Kelly in response to her original e-mail to them on September 15, 2009 needing an aggressive litigation attorney, because her current attorney is leaving Cincinnati. (Exhibit 226)

725. On September 28, 2009, Ms. Grubbs e-mailed Ms. Anderson with the concern that she kept receiving bills and calls about this fraudulent loan. (Exhibit 227)

726. She continued to state she had explained to the billing department this account is with the fraud department, but the calls and bills continue, and she is concerned about her credit.

727. Ms. Anderson responded that her credit had not been reported, but that she will continue to receive bills until it is resolved.

728. On September 29, 2009, Ms. Anderson told Ms. Grubbs that she will be making arrangements to secure the car on the contract 26017. (Exhibit 228)

729. Ms. Anderson also told Ms. Grubbs if you want the office furniture secured on the contract 16136 you will need to bring payment current today and we should be able to have the securing

of the equipment completed this week.

730. On September 29, 2009, Ms. Grubbs responded that they have been making payments on time every month and Mr. Horn can confirm. The payment they have made each month should have been applied to the furniture. (Exhibit 229)

731. Ms. Anderson explained that the contract 15970 is current but not the contract on 16136 because payment was returned due to account being frozen and a replacement payment was never received.

732. Ms. Anderson asked Ms. Grubbs if she would like to keep the equipment on that account.

733. Ms. Grubbs responded and told Ms. Anderson they will fix it today.

734. Mr. Horn then emailed a response to Ms. Anderson stating he went online to pay the account and it was being applied. It showed he was paying on account 888602 and it should have been applied to the equipment loan 16136.

735. Ms. Anderson stated she will have documentation prepared for them to sign to keep the equipment contract.

736. On September 30, 2009 Intuit Service Notice division emailed Mr. Middleton regarding QuickBooks information on their payroll service, which had been previously handled by Ms. Strunk-Zwick. (Exhibit 230)

737. On September 30, Ms. Grubbs had a meeting with United States Secret Service Special Agent Jason Rees.

738. On October 2, 2009, Ms. Grubbs received a letter from US Bank as a formal notice that the subject of agreement of 550-0026017-000 enclosed and in referenced is property that will be sold on or before October 12, 2009. (Exhibit 231)

739. The letter further informed her that typically the sale of used equipment does not cure the deficiency owed, particularly noting that Capital Concepts and Ms. Grubbs are personal guarantors and will be held responsible for any deficiency balance after the sale of the vehicle.

740. It also outlined the agreement is in default by $17, 822.10 and Ms. Grubbs may redeem the default by forwarding said amount to US Bank in form of a cashier's check.

741. This letter arrived for Ms. Grubbs after US Bank's loan department found that the loan was fraudulently obtained. Yet, US Bank still held Ms. Grubbs responsible for Ms. Strunk-Zwick's actions to obtain this loan.

742. On October 5 2009, Ms. Grubbs e-mailed Ms. Anderson from US Bank's fraud departments stating she was so distracted by the car loan that she never focused on the fraudulent furniture loan 866597. (Exhibit 232)

743. This loan Ms. Strunk-Zwick took out for the furniture listed on the fraudulent loan application was one non-existent and two the pieces Ms. Strunk-Zwick used as collateral were either paid for the year before the loan was issued or non-existent entirely.

744. Ms. Grubbs gave Ms. Anderson information regarding Agent Rees of the Secret Service.

745. Ms. Grubbs requested more information regarding her ACH account: "I have waited for many weeks for the ACH information and have gotten no response."

746. Ms. Grubbs also requested payments made on both those accounts be returned to her, as she was not the recipient of any direct benefit of either loan, nor did she apply or sign for either loan.

747. Ms. Anderson's response on October 5, 2009 was simple: "I will be sending someone out to view the furniture that is listed on both lease agreements. You will be contacted shortly."

748. On October 5, 2009 Mr. McGoran responded to Ms. Grubbs e-mail from September 30, 2009 where she requested to cancel the insurance on the Toyota and he acknowledged her request. (Exhibit 233)

749. Mr. Kelly from RKPT sent Ms. Grubbs the engagement letter which acknowledges a $10,000 capped fee, but told her to expect to pay more, thus the contingency aspect and asked for information regarding her meetings with Secret Service and Hamilton County Sheriff's office. (Exhibit 234)

750. On October 7, 2009, Ms. Grubbs forwarded information to her new attorney Mr. Kelly about

the information she received from the US Secret Service regarding Ms. Strunk-Zwick.

751. This information was about Ms. Strunk-Zwick owing the IRS over a million dollars and the state of Ohio $116,000 and how she had been running 19 different company names from her home address.

752. Mr. Kelly responded asking if she received copies of the statements that Ms. Grubbs provided to the US Secret Service.

753. During October, there is correspondence between Ms. Grubbs and Mr. Kelly's office regarding Ms. Grubbs frustration.

754. On October 22, 2009, Mr. Kelly sent a letter to Mr. William Kirkham of Frost, Brown and Todd, the statutory agent for all Sheakley companies, regarding the issues between Ms. Grubb, Capital Concepts, Tri-Serve, Ms. Strunk-Zwick and Sheakley. (Exhibit 235)

755. Mr. Kelly gave Mr. Kirkham a small overview of the ownership of Tri-Serve, the theft by Sheakley and Ms. Strunk-Zwick and asked if he was aware of this issue which was previously handled by Neil Desai.

756. Mr. Kelly continued to inform Mr. Kirkham that through Ms. Grubbs' former attorney, there was communication between to Sheakley's CFO and this is the beginning of the communication regarding Sheakley to FBT, regarding the theft of Tri-Serve.

757. Mr. Kelly explainted Ms. Strunk-Zwick did not have authority to transfer clients from Tri-Serve's client base.

758. He further detailed that after a demand letter was sent from Mr. Jaeger to Mr. Desai, Mr. Desai advised Mr. Jaeger to file suit. Mr. Kelly wanted to know if this was Mr. Kirkham's position on this as well.

759. Mr. Kelly continued to state that Ms. Strunk-Zwick and the Sheakley Group are parties to conversion of his client's property and his client must be fully and adequately compensated in this matter.

760. He also inquired if FBT was representing Ms. Strunk-Zwick in this matter.  He was told yes.

761. On October 30, 2009, Ms. Grubbs sent notice to Ms. Leanne Weydert, a Portfolio Representative with Wells Fargo Leasing, regarding Wells Fargo's notice of further action against Ms. Grubbs and Capital Concepts for the fraudulently obtained copier by Ms. Strunk-Zwick from Modern Office Methods (MOM). (Exhibit 237)

762. Ms. Grubbs outlined the details of the fraudulent acquisition by Ms. Strunk-Zwick and presented all documentation.

763. Ms. Grubbs recounted how Ms. Strunk-Zwick obtained a pay-off check for a copier made payable to Tri-Serve, via a Third Party Lease Settlement Agreement between Tri-Serve and MOM.

764. MOM was under the improper assumption that this copier was a replacement for a copier at Tri-Serve and cut a check to Ms. Strunk-Zwick.

765. This assumption by MOM could have easily been rectified through any form of due diligence on MOM's part regarding the true ownership of either Capital Concepts or Tri-Serve.

766. Ms. Strunk-Zwick then signed an agreement for a new copier placing the credit extended in Capital Concepts name. A pattern she previously displayed with US Bank.

767. Ms. Grubbs related Ms. Strunk-Zwick misrepresented herself of President of both companies.

768. Wells Fargo sought funds from Capital Concepts, not Ms. Strunk-Zwick or Tri-Serve.

769. The check was payable to Tri-Serve, and Ms. Strunk-Zwick deposited the check to an account which was unknown to TriServe.  She then transferred the money to the main Tri-Serve account and finally directed the funds to her personal account.

770. On October 30, 2009, Ms. Grubbs sent an e-mail to Mr. Kelly asking for assistance regarding the lease matter with Wells Fargo. (Exhibit 238)

771. She also forwarded an e-mail she sent to the Secret Service and the Hamilton County Sheriff's office.

772. From November 17 through 19, 2009, Ms. Grubbs forwarded e-mail correspondence from

Abby Bunge on October 6, 2009 to Mr. Kelly. (Exhibit 239)

773. The e-mails were regarding the Tri-Serve 401K plan to which Sheakley still made contributions.  John Hancock needed to know what was going on with the account.

774. She also forwarded a letter from Michael Nugent from the State of Ohio stating that there is a balance of $9091.65 owed for the second quarter of 2009. The amount which she quoted Mr. Kelly did not include the penalties and interest which had accrued, taking the total amount owed $9,523.41.

775. Ms. Grubbs had no knowledge of this balance or what it was for.

776. On November 25, 2009, Mr. Kelly forwarded correspondence to Mr. Cowan of FBT regarding the Tri-Serve 401K account of which Ms. Grubbs had no records to prepare the 550 or service them.  (Exhibit 240)

777. He additionally forwarded the information about the 401K from Ms. Bunge.

778. On November 25, 2009, Ms. Grubbs wrote Mr. Kelly referring how the entire ordeal damaged her reputation and image in her field and in the community. (Exhibit 241)

779. Ms. Grubbs outlined how Ms. Strunk-Zwick continued slandering Ms. Grubb's Capital Concepts company, explained Ms. Strunk-Zwick's statements had been detrimental and that she had been telling people that she left Tri-Serve to protect the clients because of Ms. Grubb's negligence to pay taxes.  Ms. Strunk-Zwick's wickedness had no bounds.

780. Rodger Roeser dropped Capital Concepts for tax and accounting because he was not comfortable with what he had heard from Ms. Strunk-Zwick about Capital Concepts.

781. Ms. Grubbs and Brett Horn, her son, had been asked multiple times at public events if things were okay in a concerned and worried manner.

782. Ms. Strunk-Zwick stated in public at a funeral she left Capital Concepts because it was going down the drain.

783. There are other clients Ms. Grubbs listed that had issues with the move from Tri-Serve to

Sheakley.

784. Ms. Grubbs forwarded the e-mail from Mr. Roeser to Mr. Kelly.

785. Ms. Grubbs continued to receive bills on behalf of Tri-Serve which she paid with personal funds from her retirement account.

786. On December 1, 2009, Mr. Cowan of Frost, Brown and Todd referred back to the letter sent to Mr. Kirkham on October 22, 2009. Mr. Cowan stated "Sheakley categorically denies the insertion that it and Angelia Strunk-Zwick were parties to an egregious conversion of your client's valuable property." (Exhibit 242)

787. Sheakley claimed Ms. Grubbs never hired Ms. Strunk-Zwick to run Tri-Serve and according to Ms. Strunk-Zwick she was hired to work for Capital Concepts. An incredible bunch of horse hockey.

788. Mr. Cowan's letter stated: "Jim, it is important for Ms. Horn to understand that Sheakley in no way sought to hire Ms. Strunk to gain access to the 18 Tri-Serve accounts." This is a complete lie.

789. At the time Sheakley was in the process of hiring a new Vice President of Sales, Steve Wolf, for its PEO business and recommended to Sheakley to hire Ms. Strunk because of her long history in the human resources business.

790. Mr. Cowan's letter continued to state that during the "pre-hiring discussions between Sheakley and Ms. Strunk, she indicated that there were 22 clients that would likely follow her if she left Capital Concepts." A lie.

791. Mr. Cowan's letter claimed Ms. Strunk inquired of Sheakley if they would be able to handle those clients if she were to move to Sheakley. A lie.

792. Mr. Cowan's letter also stated: "While Sheakley was willing to provide services to these clients, they were not particularly desirous of them joining Sheakley, and in fact, Sheakley advised Ms. Strunk that she would not be compensated for bringing any clients to Sheakley." A lie. Her written agreement with Sheakley disproves this Cowan allegation.

793. Also noted in this letter, Sheakley asked Ms. Strunk if she had any non-compete agreements

and she assured them that she had no prohibitions on her joining Sheakley and servicing former clients.  If this was true, and it's not, by the time August 2009 rolled around, Sheakley knew about the non-compete and confidentiality agreement for certain and chose to continue to employ Ms. Strunk-Zwick.  Therefore, under Ohio law, Plaintiffs are entitled to all their compensatory damages, punitive damages and attorney fees.

794. Cowan claimed Ms. Strunk-Zwick informed Sheakley she discussed with Ms. Grubbs that she would be moving to Sheakley and Ms. Grubbs told her they should start moving the clients to a new PEO since she had no PEO experience.  A lie.

795. Cowan stated that according to the Sheakley records, eighteen Tri-Serve clients have become Sheakley clients.

796. It also stated that: "Sheakley would be willing to transfer back the 18 clients back to Capital Concepts and Ms. Horn."  At this point, that was an empty proposal.  Ms. Grubbs had no means to service them at this point.

797. In reality, at each and every step taken by Sheakley, Sheakley executives and Ms. Strunk-Zwick stole Tri-Serve.

798. Per Exhibit 110 of this complaint, according to Ms. Strunk-Zwick's offer of employment, any clients she transferred to Sheakley she received a fifteen percent commission for the first year and a three percent trail thereafter.  This proved Sheakley and his counsel liars.

799. To contradict Sheakley's legal response, there was direct compensation to Ms. Strunk-Zwick for her transfer of clients to Sheakley, at minimum fifteen percent.

800. According to Exhibit 48, Mr. Bundy, President of Sheakley's HR Solutions, acknowledged Ms. Strunk-Zwick's commitment to both Capital Concepts and Tri-Serve.

801. It is clear that Sheakley was aware of Ms. Strunk-Zwick's image of expertise in this position prior to considering Mr. Wolf for the position of Vice President of Sales and her commitment to both Capital Concepts and Tri-Serve.

802. No one from Sheakley ever contacted Ms. Grubbs regarding this transference of clients or a non-compete or non-solicit agreement that may be held between Ms. Grubbs and Ms. Strunk-Zwick on behalf of Capital Concepts an Tri-Serve.

803. The clear denial as exhibited in this initial response is clear their CEO, Larry Sheakley, intended to cover-up his actions and the actions of other Sheakley executive's role in the theft of Tri-Serve.

804. As evidenced by Exhibit 88, on June 25, 2009, **Mr. Larry Sheakley** e-mailed Ms. Strunk-Zwick and plainly stated **"Whatever we need to do to get your business over here and our new business started."**

805. Exhibit 90 in this Complaint reveals Mr. Sheakley's disapproval that the theft of Tri-Serve will not occur by the original start date of June 29, 2009.

806. On December 3, 2009, correspondence between Mr. Adam Huffman of E-Flex Group and Ms. Grubbs stated that Ms. Martin changed the E-Flex account for Tri-Serve on July 22, 2009 to a Sheakley HR bank account. (Exhibit 243)

807. On December 22, 2009, Mr. Kelly responded to Mr. Cowan's letter stating that Ms. Grubbs disagrees with the representations passed on from Sheakley and Ms. Strunk-Zwick. (Exhibit 244)

808. Mr. Kelly continued to state that Capital Concepts is not in the position to "take back" "clients that Sheakley converted due to the damage that had already occurred for the last five months."

809. Additionally, Mr. Kelly wanted the 401K addressed, which is referenced in their previous correspondence.

810. Mr. Kelly also advised Mr. Cowan that Ms. Strunk-Zwick cut herself a check of $2690 from Capital Concepts, via the Tri-Serve payroll account and it needed to be accounted for in the third quarter 2009 tax filings. Another crime.

811. Mr. Kelly stated it is believed that all Tri-Serve clients were transferred to Sheakley by the end of the second quarter of 2009.

812. Mr. Cowan's response to Mr. Kelly on December 22, 2009 addressed the 401K plan stating the trustee of the 401K plan refused to sign the papers to transfer the 401K plan and that Sheakley had no choice but to remit the money on behalf of the employees. (Exhibit 245)

813. It also addressed the $2600 check and stated Ms. Strunk-Zwick only recalls her last paycheck.

Mr. Cowan continued stating Ms. Strunk-Zwick said she was not a signor on the Capital Concepts account so she could not just simply cut herself a check.  Another lie.

814. In reference to FBT's answer for the 401K plan and per conversation with Mr. Wegman, the reason for his not signing the paperwork initially for the 401K was to protect Tri-Serve and also because Tri-Serve was stolen.

815. Mr. Wegman was not going to sign this form and give them permission to transfer stolen funds to a new account.

816. On January 11, 2010 Capital Concepts sent a check to MasterTax in the amount of $1907.72. (Exhibit 246)

817. An e-mail between Ms. Strunk-Zwick and Mr. Wegman on January 13, 2010 stated, "I did not process any payrolls under the Tri-Serve PEO after my last day of employment at Capital Concepts/Tri-Serve which was July 3, 2010." (Exhibit 247)

818. It is obvious that there is a typo and Ms. Strunk-Zwick meant to say July 3, 2009 however it acknowledges her employment with both Tri-Serve and Capital Concepts at the same time in her mind. It contradicts FBT's response on behalf of Sheakley to Mr. Kelly on December 1, 2009.

819. In an incredible act of integrity in the face of fraud, during the month of January 2010, Ms. Grubbs agreed to give as much assistance as possible to Sheakley HR on behalf of the clients of Tri-Serve. (Exhibit 248)

820. In an e-mail dated January 18, 2010, but forwarded on January 19, 2010 to Ms. Grubbs from Ms. Strunk-Zwick, due to discussions between Capital Concepts and Sheakley, it was necessary to issue a letter determining who will be responsible for issuing W-S's to which clients and for what period of time. (Exhibit 249)

821. In Exhibit 249, Sheakley outlined who Capital Concepts will be responsible for issuing W2's on behalf of Tri-Serve and who Sheakley is stating they will provide W2's for.

822. It also outlined the dates Capital Concepts on behalf of Tri-Serve are responsible for W2's from January 1, 2009 to July 3, 2009 for specific clients.

823. On January 19, 2010, Ms. Grubbs reciprocated a letter of understanding to Ms. Strunk-Zwick on behalf of Capital Concepts. (Exhibit 250)

824. On January 19, 2010, as Sheakley's original letter doesn't address all of the issues with clients it was necessary to reissue a letter to Capital Concepts addressing issues with additional clients. (Exhibit 251)

825. On January 20, 2010, Ms. Grubbs signed a form on behalf of the USSS Electronic Crimes Task Force to conduct a complete search of all computer/electronic equipment belonging to Capital Concepts at their Cincinnati Field Office. (Exhibit 252)

826. On January 22, 2010, Mr. Wegman addressed several issues with Ms. Strunk-Zwick regarding concerns about payroll for a few W2';s and 1099. (Exhibit 253)

827. One on the list in particular is for Becki Nue and Mr. Wegman stated she is on Linda's list to receive a 1099 from Tri-Serve but he couldn't find her address or social. He asked Ms. Strunk-Zwick if he knew the account.

828. Ms. Strunk-Zwick's simple response was "No."

829. When Mr. Wegman called Ms. Becki Nue, she stated she was a missionary for Embracing Grace International Missions, Inc. and that Ms. Strunk-Zwick handled their mission funds.

830. Embracing Grace is the mission Ms. Strunk-Zwick was part of and embezzled funds from Capital Concepts on behalf of and deposited directly into the Embracing Grace account.

831. Ms. Strunk-Zwick would have been the only person who had direct knowledge of Ms. Nue's information.

832. On February 8, 2010 Mr. Wegman forwarded an email to Ms. Grubbs for her information that he received on February 5, 2010 from a former client of Tri-Serve, Mr. Joe Kirk of Kirk and Company Jewelers. (Exhibit 254)

833. When the theft of Tri-Serve occurred Mr. Kirk's company was transferred without his permission to Sheakley when Ms. Strunk-Zwick and Sheakley stole Tri-Serve from Ms. Grubbs.

834. Mr. Joe Kirk of Kirk & Company Jewelers was asking Mr. Wegman about a letter he received from the IRS stating he owed money.

835. Mr. Kirk stated since Tri-Serve merged with Sheakley he had been receiving letters from the IRS about taxes they are stating he owes.

836. Mr. Kirk referenced the most recent letter he received for form 941 due September 2009 for a total of $2303.04. He also referenced the fact he received the same letter for June 2009 and anticipates receiving one for December 2009.

837. He continued to state he cannot afford to pay this separately since this amount has already been removed from his account.

838. Ms. Strunk-Zwick assured Mr. Kirk nothing would change with his account after the "merger" and he could report the numbers the same way.

839. Mr. Kirk further detailed how he forwarded the information to Ms. Fernbach's new email with Sheakley as instructed by Ms. Strunk-Zwick.

840. He asked Mr. Wegman what to do.

841. In a February 14, 2010, e-mail from Ms. Bridget Wegman to Ms. Grubbs, Ms. Wegman completed a review of the FFB payroll account 5310210496 for June 2009 and found $24,119.45 in the month of June 2009 was sent to an Angelia Strunk routing number/bank account and believed the size of the number might persuade FFB to research the open months. (Exhibit 255)

842. Throughout the balance of the year of 2010 there is correspondence between Ms. Strunk-Zwick and Capital Concepts regarding the complications of clients in regards to unpaid taxes and 401K plans not being handled properly by Sheakley and Ms. Strunk-Zwick, which was deferred by both parties to Ms. Grubbs.

843. These discrepancies were due to the theft of Tri-Serve by Sheakley and converting those clients to Sheakley's books created numerous problems.

844. Correspondence continued between Mr. Kelly and Mr. Cowan on behalf of their clients Capital Concepts and Sheakley.

845. During 2010, Capital Concepts had to exert much energy to obtain the information used to produce the documentation needed by the US Secret Service to develop a strong enough case to subpoena the bank records.

846. The work of the employees of Capital Concepts and the Wegmans took thousands of hours to perform these tasks, ten of thousand of dollars to finance in additional payroll expenses and a loss of financial gain for Capital Concepts due to the focus on Tri-Serve.

847. Wells Fargo moved forward in 2010 with the case against Capital Concepts regarding Ms. Strunk-Zwick's forged documentation regarding the copier Ms. Strunk-Zwick fraudulently obtained from MOM in Capital Concepts' name.

848. This made it necessary for Ms. Grubbs to obtain an attorney in Iowa to represent her in the suit against Wells Fargo.

849. Ms. Grubbs spent $15,000 on attorney fees on this matter. In order to resolve the matter without further legal cost, she had to enter into an agreement to pay one-third of the contract that Ms. Strunk-Zwick fraudulently entered into on behalf of Capital Concepts.

850. Throughout the year of 2011, USSS and the US Attorney's office continued to work on the case against Ms. Strunk-Zwick.

851. In 2011, as the investigation continued Mr. Kevin Tierney the US Attorney working on the case for Capital Concepts regarding Ms. Strunk-Zwick was offered and accepted a position with FBT, Sheakley's and US Bank's law firm.

852. This placed additional delays in prosecuting Ms. Strunk-Zwick and also gave FBT valuable information and advantage over other parties involved in this litigation.

853. On January 13, 2013, Ms. Strunk-Zwick accepted a guilty plea for the crime of wire fraud in the amount of $258,158.98.

854. On January 24, 2013, less than one week after her guilty plea for a felony, Sheakley had Ms. Strunk-Zwick accept the Medical Mutual "Pillar" Award on behalf of Sheakley.

855. Ms. Strunk-Zwick remained and remains employed by Sheakley.

856. Sheakley continued to run a video on their website of Ms. Wallace, who is Ms. Strunk-Zwick's mother and who has been to prison twice over embezzlement and fraud. She is the first voice and face that visitors see in regards to Sheakley's PEO services.  The Strunk-Zwick family.  A crime family. (Exhibit 256)

857. Sheakley not only stole Tri-Serve, they have worked to protect Ms. Strunk-Zwick.

858. Larry Sheakley was aware of and participated in the theft of Tri-Serve from Ms. Grubbs.

859. Not only did the Executives, particularly Larry Sheakley, know about and participate in the theft of Tri-Serve from Ms. Grubbs, they continued their participation in these egregious actions into the present day, with the continuation of choosing to "out spend" the plaintiffs versus payment for the clients stolen from Tri-Serve.

860. The cover up by Sheakley through the assistance of their attorney's at FBT, have unnecessarily cost Plaintiffs their retirement accounts, legal expenses, future earnings of Tri-Serve, profitability of Capital Concepts due to continued focus on the problems associated with Tri-Serve.

861. Plaintiffs direct out of pocket expenses as a culminated result of Ms. Strunk-Zwick's and Sheakley's efforts include: Embezzlement, ACH & Checks $427,632.00; forgery of two bank loans $53,380.00, Fraudulent use of credit cards for personal expenses $56, 922.00; debt incurred from unpaid client taxes and Tri-Serve expenses $243, 284.00; legal expenses of over $67,483.00 prior to present counsel;  cost of staff time to investigate and document loss of monies by diversion through multiple bank accounts and falsified records $216,489.00.

862. This does not include the original cost of Tri-Serve business to Ms. Grubbs of $293,000.00 nor the cost of the start up fees for Tri-Serve of $128,976.00.  It also does not include the lost profits, punitive damages and the damages related to "It's Done!"

863. Plaintiffs want to stress the egregious conduct of Larry Sheakley, his knowledge of the theft and damages by closing the facts with the details form critical exhibits.

864. Exhibit 36, Angie Strunk-Zwick's employment agreement with Plaintiffs and dated August 1, 2007 includes:

| | | |
|---|---|---|
| 3.1. | "full time attention, energies and business efforts." |
| 4.4. | Morality Clause |
| 6.0 | Non-Compete |
| 7 | Non-Solicitation of Employees |

8 Confidentiality

Not only did Angelia Strunk-Zwick violate these provisions, Larry Sheakley and the Sheakley Defendants learned of them and failed to cut ties with her.

865. Exhibit 45 is the agreement of Capital Concepts, Inc. to purchase Tri-Serve. Linda Grubbs has to pay $3,036.75 a month for three more years.

866. On February 25, 2009, Bryan Bundy of Sheakley sent this email to Strunk-Zwick (Exhibit 48):

To: Angie
Date: Wednesday, February 25, 2009 9:31 AM

I hope things are well. Through HUMACare and Todd Riley, you and I have met several times. I have recently been tagged to lead Sheakley HR Solutions and I was hoping you might be available to assist us in a couple of areas. I am speaking specifically of your experience with PEO processes and procedures and your knowledge of the Darwin PEO/HRO software platform. **I know you are committed to TriServe and Capital Concepts** but might you be available on an independent consulting basis? Please let me know as I would like to schedule a lunch meeting to discuss the possibilities. Thank you very much.

Sincerely,

Bryan Bundy
President
Sheakley HR Solutions

(Counsel bolded what is bolded for emphasis.)

867. There can be no question. The President of Sheakley HR Solutions admitted he knows she is "committed to TriServe and Capital Concepts."

868. On June 7, 2009, Angie Strunk-Zwick sent this email to Steve Wolf of Sheakley (Exhibit 62):

To: Steve
Date: Sunday, June 7, 2009 8:55 AM

We won! State Champs! Yay ☺ I think that July is a good date. I will be back in town on Tuesday and should have a written plan by Thursday on how to transition the clients. I would like to have a better understanding of Sheakley's policies on bringing on clients and on what benefits they offer so that I can communicate that to some clients immediately. Also since I have not been in any meeting where my compensation has

been discussed, I want to make sure (from Sheakley) how exactly I'm going to be compensated **before I talk to my partner** so that I know I'm taken care of financially. My car for example is in TriServe's name so I need to work on how that will work.  I also need to know more clearly what is expected of me in term of job duties.  Part of what I will work on is what I think all of this should look like from my standpoint and send that to you on Tuesday.

Thanks,

Angie Strunk
TriServe, LTD

(Counsel bolded what is bolded for emphasis.)

869. There can be no question Sheakley Strunk-Zwick had a "partner."  She stated… "before I talk to my partner so that I know I'm taken care of financially."

870. This email followed an email from Steve where he concluded:

Angie:

Larry is really excited about what we can do at Sheakley and we talked again yesterday about options down the road; some good stuff.

Thanks,

Steve

(Yes.  Larry Sheakley was excited- counsel comment.)

871. The following is the June 25, 2009 exchange between Larry Sheakley and Angie Strunk (Exhibit 88):

To: Angie
Date:  Thursday, June 25, 2009 7:01 PM

Thanks for your email.  Sorry we haven't connected by phone today.  It is imperative to keep me in the loop on these issues as we move forward.  I have made it my top priority to get the PEO moving and it will only be done by injecting a sense of urgency in all involved.  WHATEVER YOU NEED to get your business moved over and our new business implemented we will do.  Whatever WE are not doing I want to know NOW and I will find someone who wants to do it!!!  I hope to talk to you soon.

Best,

Larry

_____

To: Larry
Date:  Thursday, June 25, 2009 10:00 PM

      Thanks Larry.  I look forward to working wih you and getting everything moved over very soon.

Thanks,

Angie Strunk
TriServe, LTD a subsidiary of Capital Concepts, Inc.

872. The following Exhibit 90 is Larry Sheakley's continued urgency:

To:  Angie Strunk, Bryan Bundy, Matt Sheakley, Steve Wolf, Heather Fair
Date:  Thursday, June 25, 2009 7:32 PM

      Bryan.  Got ur message earlier.  Are these things done??  If not why??  When we talked yesterday I made it clear that we need this done NOW and u had my authority to use whoever in the building u needed to do it.  Please let me know who's dragging their feet and why.  I have give my word so I want to be kept informed.  If ANGIE has given us a list to do's then let's check them off and what we don't have done let's get done!!  I called John Dunn this morning at 7 AM to run down a work comp quote for ANGIE.  We need to start asking why work comp quotes take so long to get, health rates etc. etc.

Best,

Larry

873. Exhibit 135 is Angie Strunk-Zwick's email to the TriServe customers dated July 3, 2009:

Customers:

      We are moving!  In order to better serve you, we are partnering with Sheakley HR and moving our offices.  As many of you know, we have partnered with Sheakley over the years with regards to our workers compensation and unemployment management.  We have been blessed to have experienced tremendous growth over the last 6 months.  We find ourselves needing more office space and more resources to ensure that our customer service level continues to meet your expectations.  By moving into Sheakley Group we will be able to provide you and your employees with additional resources, services, and benefits, while continuing to provide you with the service that

you have grown accustomed to expect from TriServe.  Nothing will change from your standpoint.  We will have new contact information, but nothing else will change.  You will begin to see the Sheakley HR name and we will be introducing new benefits and new services to assist you with growing your business.  Our focus has always been and will continue to be assisting you, the small business owner, with Rediscovering Your Passion.  We appreciate your business over the years and look forward to continuing a long, beneficial relationship with you and your employees.  As always, if you have any questions or concerns please feel free to call me.

Effective Monday, July 6, 2009 our Contact Information will be:
TriServe LTD c/o Sheakley HR Solutions
One Sheakley Way
Cincinnati, OH 45246
513-728-6678 P
513-672-4501 F

Payroll Time Submission via web:  www.triservehr.com
Payroll Time Submission via fax:  513-672-4501
Payroll Time Submission via email:  sfernbach@sheakleyhr.com

Angie Strunk Direct Dial:  513-728-6674
Email:  astrunk@sheakleyhr.com

Susan Fernbach Direct Dial:  513-728-6667
Email:  sfernbach@sheakleyhr.com

Kym Martin Direct Dial:  513-728-6668
Email:  kmartin@sheakleyhr.com

Thanks,

Angie Strunk


874. Ms. Strunk-Zwick uses the words "we."  Who is we?  Linda Grubbs, of course.  She uses "we" eight times.  She even has the nerve to use the TriServe slogan:  "Rediscovering Your Passion."  In addition, she uses the name TriServe LTD c/o Sheakley HR Solutions.  The clear explicit comment is "we" have become part of Sheakley.  Not just the clients.  Not just the assets.  Not just personnel.  The entire company.  She even uses triservehr.com for payroll time submissions.


875. Exhibit 136 reflects how Ms. Strunk-Zwick and Sheakley had the nerve to change Capital Concepts, Inc.'s Workers Compensation address in their clandestine theft.


876. Noticeably absent from the exhibits attached which we took from various public websites is any reference by Sheakley of Ms. Angie Strunk-Zwick's employment at Capital Concepts and

92

Tri-Serve.  They leave it off her resume.

877. It is uncertain at the time of this filing, but it is believed Sheakley landed Paysource and/or their clients in part from the work Angie Strunk-Zwick logged on the account while she worked for Plaintiffs.  Shell companies are often used in the PEO business to hide true ownership and it appears to have done so in this case.

878. In the beginning of this dispute after the theft, FBT through Mr. Gowan assured Jim Kelly they represented both Strunk-Zwick and Sheakley.  Martin Pinales would later take over the representation of Strunk-Zwick in the federal criminal case set for sentencing May 1, 2013.

879. Linda Grubbs was told by her counsel at the time the events unfolded in July 2009 and told by the US Secret Service not to communicate with anyone including her lost clients.  She was advised not to fight for her stolen clients.  However, her TriServe personnel, the software and the systems were taken with the clients.  Plaintiffs could not service them if they returned.

880. In a bizarre development, the prior lawyer of Plaintiffs, Jim Kelly, entered into an agreement without the consent of Plaintiffs, pertaining to correspondence and confidentiality with Sheakley's law firm, FBT.  This agreement covers information obtained from Angie Strunk-Zwick's infamous "pink laptop."  Jim Kelly and FBT have refused to turn this over to counsel in their prelitigation investigation.

881. Capital Concepts growth was put on hold for almost three years due to the reconstruction and investigation of accounts for both TriServe and Capital Concepts.

882. Money and efforts which would have been used to grow the business instead went to attorney's fees, overtime for staff, not generation of new business due to the focus of the TriServe theft.

883. Capital Concepts is still paying the debts of TriServe and its clients to this day.  The stress and financial devastation the theft of TriServe cost them is still being felt to this day.  Over $900,000.00 was pulled out of the Grubbs retirement account to pay the debts of TriServe and its liabilities.  Ms. Grubbs felt a moral obligation who placed their trust and money in the hands of TriServe, with Sheakley receiving money from those clients.  In a normal sale of a PEO, this would not have occurred.  There would have been a transference of money to the owners of PEO, and it would have been ensured to include a debt free transfer with a profit to the previous owners.  Ms. Grubbs is still paying money to Mr. Wegman, the former owner, for TriServe to this day.

884. When Mr. and Ms. Grubbs pulled the money out of their retirement account it was in a down

market.  Since the withdraw, the market increased and they have lost all profit from the rally.

885. Capital Concepts lost clients due to the theft of TriServe.  The rumors and innuendo about Capital Concepts having financial issues led to several clients canceling services.  One of the mutual benefits of owning TriServe and Capital Concepts would have been the 401K they were responsible for and the accounting and investment business.

886. When clients began to complain to Sheakley that their tax liabilities or other items were not paid, all blame was placed by them on Ms. Grubbs, unfairly generating a bad reputation in the business and community.  In reality it was Ms. Strunk-Zwick and Sheakley who were directly responsible for the circumstances surrounding these items not being paid.

## DAMAGES

887. Direct out of pocket losses:                                              $427,632.00
      Embezzlement, ACH and checks:                            $53,380.00
      Forgery of two bank loans:                               $56, 922.00
      Fraudulent use of credit cards for personal expenses:    $243,284.00
      Debt incurred from unpaid client taxes and TriServe expenses:  $52,483.00

Loss by theft of TriServe Business Unit:

    Over the weekend of July 4, 2009, Ms. Strunk removed all records for the entire company of TriServe.  Including clients, employees, and office software to the offices of the Sheakley Corporation where she accepted a position of Vice President of Human Resources.  She attempted to destroy all computer files on the company server to conceal the means by which she executed this theft.  She then sent a letter to all clients advising that after "parntering" with Sheakley, they would be serviced from the Sheakley office.  Ms. Strunk received a 15% first year bonus for all these clients along with a 3% annual trail, which means she is still being paid for stolen clients.

The accrued losses to date include:

    Original Cost of TriServe:                               $293,000.00
    Cost of equipment, software, and start up fees:          $128,976.00
    Cost of staff time to investigate and document
    loss of monies by diversion through multiple
    bank accounts and falsified companies:                   $216,489.00
    Estimated loss of revenue for the last 46 months:        $1,564,000.00

    Estimated Loss of future earnings for TriServe:          $22,500.00/Month
    (does not include the large number of clients that were being negotiated and later added
    directly to Sheakley accounts by Ms. Strunk.)

Impairment of earnings from my primary business unit, Capital Concepts, Inc.: To Be Assessed

The performance of Capital Concepts had increased year on year, every year until the losses attributed to the activities of Defendants as detailed above. As funds were diverted to cover the losses, Ms. Grubbs suffered impairments of growth and insufficiency of funds. In fact, except for access to the personal retirement savings of her husband, it is with certainty that her primary business would have failed. It is also impossible to calculate the financial loss due to loss of clients or potential clients who were influenced by local rumors of the destructive acts by Defendant.

The loss of income throughout this period of criminal activity and continuing forward into the future as a result of a diversion of personal retirement funds for continuing capitalization and operations of my primary business cannot be calculated. The pain of these losses were compounded by withdrawals required during periods of greatest drop in market values, plus mandatory penalties for excessive withdrawals.

To date, Linda Grubbs has not been compensated by insurance or another source with respect to all or a portion of her losses.

888. Ms. Angie Strunk-Zwick filed bankruptcy June 30, 2009. It was discharged October 13, 2009. It was terminated October 28, 2009. She filed days before joining Sheakley for a reason. Fresh start. Bigger salary. She did not list Plaintiff's claims in her bankruptcy. These filed claims are not discharged.

889. The Sheakley Companies began on or about June 29, 2009 using "It's Done!" (Exhibit 85) (Exhibit 99) (Exhibit 102) (Exhibit 183) (Exhibit 219) This was right before Ms. Strunk-Zwick and the Sheakley Defendants completed their theft of TriServe.

890. Sheakley doubled Ms. Strunk-Zwick's salary and increased her benefits. (Exhibit 110) He also paid her commission. We will soon learn what else he paid and/or she received for her role in the theft.

891. The Defendants Angie Strunk-Zwick, Larry Sheakley and all related Sheakley Defendants are rackateers in no different a light than bully mobsters. It's called racketeering for a reason.

892. The crimes and frauds committed support Civil Rico and punitive damages. Angelia Strunk-Zwick was charged by Information filed December 6, 2013 in the Southern District of Ohio, Western Division, 1:12CR-132 with 18 U.S.C. S 1343 embezzlement by wire fraud. She pled guilty on January 16, 2013. Sentencing is set for May 1, 2013.

893. From November 17, 2006 to July 17, 2009, Eisen billed and was paid $43,600.20 by TriServe.

This included "It's Done!" branding.

894. Based upon the facts, the following state and federal crimes were committed by one or more of the Defendants during this case timeline as described in the paragraphs and Exhibits in this Complaint:

    A.  Chapter 2913 Ohio State Law (Various Forms of Theft, Forgery and Fraud)

    B.  Chapter 2921 Ohio State Law (Disclosure of Confidential Information)

    C.  Chapter 2923 Ohio State Law (Conspiracy, Attempt and Complicity)

    D.  Title 18 USC
        Chapter 9 Bankruptcy
        Section 152 Concealment of Assets: False Oaths and Claims
        Section 157 Bankruptcy Fraud
        (Applies only to Angie Strunk-Zwick)

    E.  Chapter 47 Fraud and False Statements

| | |
|---|---|
| Section 1028A | Aggravated Identity Theft |
| Section 1029 | Fraud and Related Activity in Connection with Access Devices |
| Section 1030 | Fraud and Related Activity in Connection with Computers |
| Section 1037 | Fraud and Related Activity in Connection with Electronic Mail |
| Section 1038 | False Information and Hoaxes |
| Section 1039 | Fraud and Related Activity in Connection with Obtaining Confidential Phone Records Information covered by an entity |

## COUNT I

**Breach of Contract against Angelia Strunk-Zwick**
**(Plaintiffs also seek damages against Sheakley Defendants Under This Count)**

895. The allegations set forth in the prior paragraphs are incorporated as if fully set forth herein.

896. On August 8, 2007, Plaintiffs offered Defendant Ms. Strunk-Zwick an employment, non-compete and confidentiality agreement.

897. On August 2007, Defendant Ms. Strunk-Zwick accepted an employment agreement with Plaintiffs.

898. These agreements between Plaintiffs and Defendant Strunk-Zwick was made for adequate mutual consideration.

899. From February 2009 through today and continuing to the present, Defendant Strunk-Zwick materially breached her employment, non-compete and confidentiality agreement with Plaintiffs.

900. All Sheakley Defendants knew or should have known about this agreement and with certainty knew about the agreement from August 2009 to the date this lawsuit is filed and is continuing. Despite this knowledge, Sheakley continued to employ and benefit from Strunk-Zwick's employment and breach of the non-compete and confidentiality clause and still benefit to this day. Plaintiffs are also entitled to damages from February 2009 to today and continuing. As to Sheakley Defendants, Plaintiffs relay on UZ v. Midwest 147 App 3 382 (2001).

## COUNT II

**Breach of Contract against Angelia Strunk-Zwick, Kimberly Martin and Susan Fernbach (Plaintiffs also seek damages against Sheakley Defendants Under This Count)**

901. The allegations set forth in the prior paragraphs are incorporated as if fully set forth herein.

902. In consideration for their employment with Plaintiffs Angelia Strunk-Zwick, Kimberly Martin, and Susan Fernbach signed a covenant not to compete agreement with Plaintiffs.

903. From February 2009, through today and continuing to the present Angelia Strunk-Zwick, Kimberly Martin, and Susan Fernbach materially breached their duties under the agreement by operating a competing business, stealing the clients of Plaintiffs and infringing on Plaintiffs marks.

904. Plaintiffs are entitled to damages based upon the agreement covenants not to compete and confidentiality and from all persons acting in concert and participation with Ms. Strunk-Zwick, Kimberly Martin and Susan Fernbach including the Sheakley Defendants. Plaintiffs are also entitled to damages from February 2009 to today and continuing. As to Sheakley Defendants, Plaintiffs rely on UZ v. Midwest 147 Ohio App. 3d382 (2001).

## COUNT III

### Unfair Competition under 15 U.S.C. § 1125(a) against Sheakley Defendants and Eisen Defendants

905. The allegations set forth in the prior paragraphs are incorporated as if fully set forth herein.

906. By their actions described, the Sheakley Defendants has, without Plaintiffs' consent, in connection with the operation of the Sheakley Group, used in commerce a word, name, symbol, device, or any combination thereof, namely, Tri-Serve's registered mark which is likely to cause confusion, cause mistake, or to deceive as to the affiliation, connection, and/or association of Defendant with Tri-Serve. Eisen Defendants participated in this process.

907. Upon information and belief, Sheakley Defendants and Eisen Defendants conduct has been willful and with knowledge of the unauthorized use of Tri-Serve's marks.

908. The actions of Sheakley Defendants and Eisen Defendants described in this Complaint constitute unfair competition in violation of 15 U.S.C. §1125(a). Defendants' acts have caused and will continue to cause serious and irreparable injury to Tri-Serve.

## COUNT IV

### Breach of Fiduciary Duty Against All Defendants

909. The allegations set forth in the prior paragraphs are incorporated as if fully set forth herein.

910. All Defendants as described in the facts in varying degrees and reasons owed Plaintiffs certain fiduciary duties including, without limitation, competence, loyalty, and utmost good faith.

911. Defendants breached her duty of loyalty by interfering with Capital Concepts and Tri-Serve's economic relationships as described herein.

912. Defendants breached their fiduciary duties owed to Plaintiffs by, among other things: (i) conspiring to defraud and divert loan Capital Concepts loan proceeds to other accounts and persons; (ii) concealing unauthorized lines of credit and relevant information concerning Capital Concepts financial status; (iii) coordinating the fraudulent and inaccurate preparation of Loan Requests and Signature Cards for the sole and unlawful purpose of furthering a scheme to defraud the Plaintiffs; (iv) organizing the fraudulent transfer of proprietary information to the Sheakley entities; (v) purposefully diverting Plaintiffs' business to the Sheakley entities. (vi)

and all acts described in this complaint.

913. Defendants conduct was wanton, willful, malicious, and/or in reckless disregard of Plaintiffs' rights.

## COUNT V

### Conversion Against All Defendants

914. Plaintiffs incorporate by reference each and every previous paragraph as if fully restated herein.

915. Plaintiffs owned and had a right to possess certain property and money.

916. The actions of the Defendants disposed Plaintiffs completely of their rights to the same property and money.

## COUNT VI

### Civil Conspiracy Sheakley Defendants, Angelia Strunk-Zwick, Susan Fernbach, Kimberly Martin and Frost Brown Todd, LLC

917. The allegations set forth in the prior paragraphs are incorporated as if fully set forth herein.

918. The Sheakley Defendants and Frost Brown Todd, LLC entered into an agreement and/or understanding and otherwise conspired with Defendants Angelia Strunk-Zwick, Susan Fernbach, Kimberly Martin and others as yet unnamed to tortiously interfere with Plaintiffs' business.

919. In furtherance of the conspiracy, the Sheakley Defendants fraudulently obtained and utilized Plaintiffs' proprietary information with the intent of deceiving and defrauding Plaintiffs.

## COUNT VII

### Fraudulent Scheme to Convert Loan Proceeds against Angelia Strunk-Zwick, James Allen Dean, US Bank, and First Financial Bancorp

920. Plaintiffs repeat and restate the facts set forth in the prior paragraphs of their complaint as if fully set forth at length herein.

921. Defendants Angelia Strunk-Zwick, James Allen, US Bank and First Financial Bancorp knowingly and intentionally participated in a fraudulent scheme to accomplish the diversion of Plaintiffs loan proceeds and other illicit acts, by which the loan proceeds were secretly transferred and diverted to Angelia  Strunk-Zwick's personal accounts for purposes unrelated to the operation of the Plaintiffs business.

922. The conduct of Defendants Angelia Strunk-Zwick, James Allen Dean, US Bank and First Financial Bancorp, Inc. was wanton, willful, and in reckless disregard of the Plaintiff's rights.

## COUNT VIII

**1303.49 Negligence contributing to forged signature or alteration of instrument against US Bank and First Financial Bancorp**

923. Plaintiffs repeat and restate the facts set forth in the prior paragraphs of their complaint as if fully set forth at length herein.

924. Defendant US Bank and First Financial Bancorp failed to exercise ordinary care in paying or taking in instruments purportedly signed by Ms. Grubbs.

925. Defendant US Bank's and First Financial Bancorp's failure to exercise ordinary care substantially contributed to the financial loss suffered by Plaintiffs.

## COUNT IX

### Spoliation of Evidence Against All Defendants

926. Plaintiffs incorporate by reference each and every previous paragraph as if fully restated herein.

927. Defendants willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiffs' records and related evidence.

928. Defendants spoiled evidence with knowledge that there was pending or probable litigation involving the Plaintiffs.

929. Defendants' conduct was designed to disrupt Plaintiffs' potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiffs.

## COUNT X

**Breach of the Covenant of Good Faith and Fair Dealing against US Bank and First Financial Bancorp**

930. Plaintiffs repeat and restate the facts set forth in the prior paragraphs of their complaint as if fully set forth at length herein.

931. Defendant US Bank and First Financial Bancorp failed to exercise ordinary care in paying or taking in instruments purportedly signed by Ms. Grubbs.

932. Defendant US Bank's and First Financial Bancorp's failure to exercise ordinary care substantially contributed to the financial loss suffered by Plaintiffs.

## COUNT XI

**Claim Under Ohio Deceptive Trade Practices Act (ODTPA)**
**Against All Defendants Except First Financial Bancorp, US Bancorp, Frost Brown Todd, LLC and James Allen Dean**

933. Plaintiffs repeat and restate the facts set forth in the prior paragraphs of their complaint as if fully set forth at length herein.

934. Defendants in the course of their business have participated in some or all of the following:

   a. Passed off goods and services of Plaintiffs as their own;

   b. Caused likelihood of confusion as to the source, approval, association and certification of goods and services;

935. As a result of these Defendants' deceptive trade practices Plaintiffs have suffered damages.

## COUNT XII

**Tortuous Interference with Business Relations against All Defendants**

936. Plaintiffs incorporate by reference each and every previous paragraph as if fully restated herein.

937. Plaintiffs had valid business relationships with third parties

101

938. Defendants knew that Plaintiffs had valid business relationships with these third parties.

939. Defendants' actions intentionally interfered and caused the breach and termination of these business relationships.

940. Plaintiffs have suffered damages as a result of Defendants' actions.

## COUNT XIII

### Fraud Against All Defendants

941. Plaintiffs incorporate by reference each and every previous paragraph as if fully restated herein.

942. Defendants in their course of action engaged in misrepresentations and/or concealment of facts that were material to the Plaintiffs.

943. Such misrepresentations and/or concealments were made with knowledge that they were false or with utter disregard and recklessness as to the truth.

944. Such misrepresentations and/or concealments were made with the intent of misleading Plaintiffs into relaying upon them.

945. Plaintiffs exercised justifiable reliance upon the misrepresentations and/or concealments.

946. Plaintiffs have suffered injuries as a result of these actions.

## COUNT XIV:  RICO Claims

### Against Ms. Strunk-Zwick and Sheakley Defendants

947. Plaintiffs incorporate by reference each and every previous paragraph as if fully restated herein.

948. Defendants are a culpable person subject to liability under the RICO statute as they are "an entity capable of holding a legal or beneficial interest in property."

949. Defendants at all relevant times were employees of, participants in, and associated in the enterprise of Defendants through their employment, management of Defendants.  Defendants therefore are an "enterprise" as defined by 18 U.S.C. §1961(4) as "any individual, partnership,

corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."

950. Defendants, an "enterprise" as previously noted under 18 U.S.C. §1961(4), have directly engaged in the production and distribution of goods and services in interstate commerce and as such have affected interstate commerce as an "enterprise".

951. Defendants, an "enterprise" as previously noted under 18 U.S.C. §1961(4), have engaged in acts of racketeering activity which include the following during this case timeline as described in the paragraph and Exhibits in this Complaint:

    A. Chapter 2913 Ohio State Law (Various Forms of Theft, Forgery and Fraud)

    B. Chapter 2921 Ohio State Law (Disclosure of Confidential Information)

    C. Chapter 2923 Ohio State Law (Conspiracy, Attempt and Complicity)

    D. Title 18 USC
       Chapter 9 Bankruptcy
       Section 152 Concealment of Assets: False Oaths and Claims
       Section 157 Bankruptcy Fraud
       (Applies only to Angie Strunk-Zwick)

    E. Chapter 47 Fraud and False Statements

        Section 1028A      Aggravated Identity Theft

        Section 1029       Fraud and Related Activity in Connection with Access Devices

        Section 1030       Fraud and Related Activity in Connection with Computers

        Section 1037       Fraud and Related Activity in Connection with Electronic Mail

        Section 1038       False Information and Hoaxes

        Section 1039       Fraud and Related Activity in Connection with Obtaining Confidential Phone Records Information covered by an entity

952. Defendants, an "enterprise" as previously noted under 18 U.S.C. §1961(4), have engaged in a pattern of racketeering activity with acts related to each other by similar purposes victims, participants and methods of commission.

953. Defendants, an "enterprise" as previously noted under 18 U.S.C. §1961(4), have engaged in a pattern of racketeering activity that has been continuous over a substantial period of time continuing to the present.

954. Defendants, an "enterprise" as previously noted under 18 U.S.C. §1961(4), have engaged in a pattern of racketeering activity that has been part of their regular way of doing business.

955. All named Plaintiffs are "persons" as defined by 18 U.S.C. 1964(c) which creates a private right of action for any "person" who has suffered a compensable injury including natural persons.

956. All named Plaintiffs have sustained injury to their business or property including out-of-pocket financial losses, lost wages, lost economic opportunities, and lost benefits all by reason of Defendants previously identified pattern of racketeering activity including the following:

| | |
|---|---|
| Direct out of pocket losses: | $427,632.00 |
| Embezzlement, ACH and checks: | $53,380.00 |
| Forgery of two bank loans: | $56, 922.00 |
| Fraudulent use of credit cards for personal expenses: | $243,284.00 |
| Debt incurred from unpaid client taxes and TriServe expenses: | $52,483.00 |

Loss by theft of TriServe Business Unit:

Over the weekend of July 4, 2009, Ms. Strunk removed all records for the entire company of TriServe.  Including clients, employees, and office software to the offices of the Sheakley Corporation where she accepted a position of Vice President of Human Resources.  She attempted to destroy all computer files on the company server to conceal the means by which she executed this theft.  She then sent a letter to all clients advising that after "partnering" with Sheakley, they would be serviced from the Sheakley office.  Ms. Strunk received a 15% first year bonus for all these clients along with a 3% annual trail, which means she is still being paid for stolen clients.

The accrued losses to date include:

| | |
|---|---|
| Original Cost of TriServe: | $293,000.00 |
| Cost of equipment, software, and start up fees: | $128,976.00 |
| Cost of staff time to investigate and document loss of monies by diversion through multiple bank accounts and falsified companies: | $216,489.00 |
| Estimated loss of revenue for the last 46 months: | $1,564,000.00 |

| | |
|---|---|
| Estimated Loss of future earnings for TriServe: | $22,500.00/Month |

(does not include the large number of clients that were being negotiated and later added directly to Sheakley accounts by Ms. Strunk.)

Impairment of earnings from my primary business unit, Capital Concepts, Inc.: To Be Assessed

The performance of Capital Concepts had increased year on year, every year until the losses attributed to the activities of Defendants as detailed above. As funds were diverted to cover the losses, Ms. Grubbs suffered impairments of growth and insufficiency of funds. In fact, except for access to the personal retirement savings of her husband, it is with certainty that her primary business would have failed. It is also impossible to calculate the financial loss due to loss of clients or potential clients who were influenced by local rumors of the destructive acts by Defendant.

The loss of income throughout this period of criminal activity and continuing forward into the future as a result of a diversion of personal retirement funds for continuing capitalization and operations of my primary business cannot be calculated. The pain of these losses were compounded by withdrawals required during periods of greatest drop in market values, plus mandatory penalties for excessive withdrawals.

To date, Linda Grubbs has not been compensated by insurance or another source with respect to all or a portion of her losses.

957. All Plaintiffs have sustained their injuries within the past four (4) years and thus are not barred by the applicable statute of limitations.

## COUNT XV

**Lanham Act (Trademark Infringement) Against Sheakley Defendants, Eisen Defendants and Ms. Strunk-Zwick**

958. Plaintiffs incorporate by reference each and every previous paragraph as if fully restated herein.

959. Plaintiffs hold valid and legally protected trademarks under 15 U.S.C. §1114 and/or 15 U.S.C. §1125(a).

960. Plaintiffs are the legal and valid owners of said trademarks.

961. The Defendants misappropriation and use of these trademarks for goods and services has caused a likelihood of confusion between Defendants and Plaintiffs goods and services.

962. Plaintiffs have suffered damages as a result of these violations.

## COUNT XVI

**Lanham Act (False Advertising) Against Sheakley Defendants and Ms. Strunk-Zwick**

963. Plaintiffs incorporate by reference each and every previous paragraph as if fully restated herein.

964. Defendants have made false and misleading statement of fact in commercial advertisements.

965. These false and misleading statements deceived or held the capacity to deceive substantial segments of potential consumers.

966. These false and misleading statements were material and influenced and were likely to influence consumer purchasing decisions.

967. The products falsely advertised were goods or services in interstate commerce.

968. Plaintiffs have sustained injuries as a result of the false and misleading statements.

## COUNT XVII

**Misappropriation of Trade Secrets (OHIO REV. CODE §1333.61)
Against Sheakley Defendants, Eisen Defendants, Ms. Strunk-Zwick, Kimberly Martin and Susan Fernbach**

969. Plaintiffs incorporate by reference each and every previous paragraph as if fully restated herein.

970. Plaintiffs possessed trade secrets including business information, plans and financial information.

971. Defendants misappropriated Plaintiffs' trade secrets by acquiring such trade secrets by improper means.

972. As a result of said misappropriation Plaintiffs have suffered damages.

## COUNT XVIII

**Tortious Interference With Contracts
Against All Defendants**

973. Plaintiffs incorporate by reference each and every previous paragraph as if fully restated herein.

974.Plaintiffs had valid and legal contracts with third parties

975.Defendants knew that Plaintiffs had valid and legal contracts with these third parties.

976.Defendants' actions intentionally procured the breach of these contracts.

977.Defendants have no valid justification for procuring the breach of these contracts.

978.Plaintiffs have suffered damages as a result of the breach.

## COUNT XVIV

**Unjust Enrichment
Against All Defendants**

979.Plaintiffs incorporate by reference each and every previous paragraph as if fully restated herein.

980.Defendants by their actions were conferred a benefit by the Plaintiffs.

981.Defendants knew that they had been conferred a benefit by the Plaintiffs.

982.Defendants have wrongfully retained these benefits and have not reimbursed or otherwise paid Plaintiffs for the retention of these benefits.

983.As a result of these actions Defendants have been unjustly enriched at the expense of the Plaintiffs.

984.As a result of Defendants' actions the Plaintiffs have suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request a trial by jury, a verdict and judgment for the following damages:

1.    The damages detailed in this Complaint
2.    All future revenue lost
3.    All incidental costs and expenses
4.    Punitive damages;
5.    Costs and Interest;

107

6.      Attorneys' fees;
7.      All damages from stolen proprietary and intellectual property;
8.      Injunctive relief is sought;
9.      Treble damages;
10.    Emotional damages including stress;
11.    All other relief to which they are entitled to.

Based upon 1-11 itemizations of damages, the damages sought exceed the minimal jurisdictional amount of this court. Plaintiffs demand one billion dollars in compensatory damages and punitive damages jointly and several from all Defendants.

Respectfully submitted,

_Eric C. Deters (#0038050)_
Eric C. Deters & Partners, P.S.C.
635 West Seventh Street, Suite 401
Cincinnati, Ohio 45203
Phone: (513) 322-8151
Fax: (513) 381-4084
Email: eric@ericdeters.com
*Attorney for the Plaintiffs*

## VERIFICATION

I, Linda Grubbs, have reviewed this Complaint and attest to the facts pled and exhibits attached to the best of my knowledge and belief.

LINDA GRUBBS

NOTARY

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me, a Notary Public, by Linda Grubbs on this __12__ day of April, 2013.

_Charles R. Holbrook_ #462450
NOTARY PUBLIC
My Commission Exp.: _3-14-2016_

108

Kenton County

State of Kentucky